Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Frank P. Tiscione, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance Company,
Liberty Mutual Fire Insurance Company, Liberty Insurance
Corporation, The First Liberty Insurance Corporation, LM
Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance
Company, Liberty County Mutual Insurance Company, LM
Property and Casualty Insurance Company, Safeco Company
of Indiana, and American States Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

LIBERTY MUTUAL INSURANCE COMPANY,
LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY INSURANCE CORPORATION, THE FIRST
LIBERTY INSURANCE CORPORATION, LM
INSURANCE CORPORATION, LIBERTY MUTUAL MID-
ATLANTIC INSURANCE COMPANY, LIBERTY
COUNTY MUTUAL INSURANCE COMPANY, LM
PROPERTY and CASUALTY INSURANCE COMPANY,
SAFECO COMPANY OF INDIANA, and AMERICAN
STATES INSURANCE COMPANY,

Docket No.: ____(    )

**Plaintiff Demands a
Trial by Jury**

Plaintiffs,

-against-

OLEG GOLOUBENKO MEDICAL, P.C.,
OLEG GOLOUBENKO, M.D.,
AMON CHIROPRACTIC, P.C.,
CRONOS CHIROPRACTIC, P.C.,
MICHAEL GORELIK, D.C.,
PRIORITY CARE REHAB & PHYSICAL THERAPY, P.C.,
WAEL BAKRY, P.T.,
COUNTY MEDICAL SERVICES, P.C.,
WILLIAM FOCAZIO, M.D.,
IRINA BELYANSKAYA O.T., P.C.,
IRINA BELYANSKAYA, O.T.,
NEPTUNE MEDICAL SERVICES, P.C.,

1

ALEXANDER KATZ, M.D.,
BEST TOUCH PT, P.C.,
ABOURYA ABDELHAMID MAHMOUD, P.T.,
PHYSICAL INFINITY MEDICAL, P.C.,
PAULINE RAITSES, D.O.,
IGOR BELYANSKY,
GOLDEN TREE SIE LLC,
IRINA BARINOV, and
JOHN DOE DEFENDANTS 1-10,

Defendants.

---------------------------------------------------------------------------X

<u>**COMPLAINT**</u>

Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company (collectively "Liberty Mutual" or "Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This action seeks to recover more than $855,000.00 that Defendants have wrongfully obtained from Liberty Mutual by submitting and/or causing to be submitted hundreds of fraudulent No-Fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including initial and follow-up examinations, diagnostic testing, outcome assessment tests, computerized range of motion and muscle strength tests, activity limitation measurements and physical performance tests, trigger point injections, chiropractic services, physical therapy, and occupational therapy services (collectively, the "Fraudulent Services"), allegedly provided to New York automobile accident victims covered by policies of insurance issued by Liberty Mutual ("Insureds").

2.      The Fraudulent Services are the byproduct of a scheme perpetrated by the Defendants at two (2) purported medical "clinics", located at: (i) 282-284 Avenue X, Brooklyn, New York (the "Avenue X Clinic"), and (ii) 358 Neptune Avenue, Brooklyn, New York (the "Neptune Avenue Clinic") (collectively, the "Clinics"), which are illegally owned and controlled by unlicensed laypersons. To effectuate the scheme, the unlicensed laypersons "purchased" the licenses of healthcare professionals in order to unlawfully incorporate, own, and/or control various healthcare practices, and then cause those healthcare practices to unlawfully operate from the Clinics. The unlicensed laypersons used their control of the healthcare practices to implement a fraudulent, pre-determined treatment and billing protocol in order to enrich themselves by exploiting the Insureds' "No-Fault" insurance benefits.

3.      As part of the fraudulent scheme, the Defendants billed Liberty Mutual and the New York automobile industry for a laundry list of unnecessary treatments, using as "fronts" the licenses and tax identification numbers of a large number of healthcare professionals and practices. Liberty Mutual has received billing for alleged treatments rendered to Insureds at the Clinics from a "revolving door" of more than one hundred (100) separately identified healthcare providers, including Defendants Oleg Goloubenko Medical, P.C. ("Goloubenko Medical"), Amon Chiropractic, P.C. ("Amon Chiro"), Cronos Chiropractic, P.C. ("Cronos Chiro"), Priority Care Rehab & Physical Therapy, P.C. ("Priority Care"), County Medical Services, P.C. ("County Medical"), Irina Belyanskaya O.T., P.C. ("Belyanskaya OT"), Neptune Medical Services, P.C. ("Neptune Medical"), Best Touch PT, P.C. ("Best Touch"), Physical Infinity Medical, P.C. ("Infinity Medical"), as well as the sole proprietorships of Oleg Goloubenko, M.D. ("Goloubenko SP") and Michael Gorelik, D.C. ("Gorelik SP") (collectively, the "Provider Defendants").

3

4.      Through this action, Liberty Mutual seeks recovery of more than $855,000.00 that has been wrongfully obtained from it along with a declaration that it is not legally obligated to pay reimbursement of more than $381,000.00 in pending No-Fault insurance claims that have been submitted by or on behalf of the Provider Defendants because:

(i)      the Provider Defendants were unlawfully incorporated, owned, controlled, and operated by unlicensed laypersons;

(ii)     the Provider Defendants submitted claims for Fraudulent Services that were not medically necessary and were provided – to the extent provided at all – pursuant to fraudulent, pre-determined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    the Provider Defendants submitted claims for Fraudulent Services using billing codes that misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual;

(iv)     the Provider Defendants engaged in unlawful financial arrangements with unlicensed individuals; and

(v)      in many cases, the Fraudulent Services were not eligible for reimbursement because they were provided – to the extent provided at all – by independent contractors rather than by the Provider Defendants' employees.

5.      The Defendants fall into the following categories:

(i)      the Provider Defendants are medical, chiropractic, physical therapy, and occupational therapy practices through which the Fraudulent Services purportedly were performed and billed to New York automobile insurance companies, including Liberty Mutual.

(ii)     Oleg Goloubenko, M.D. ("Goloubenko"), Michael Gorelik, D.C. ("Gorelik"), Wael Bakry, P.T. ("Bakry"), William Focazio, M.D. ("Focazio"), Irina Belyanskaya, O.T. ("Belyanskaya"), Alexander Katz, M.D. ("Katz"), Abourya Abdelhamid Mahmoud, P.T. ("Mahmoud"), and Pauline Raitses, D.O. ("Raitses") (collectively, the "Nominal Owner Defendants") are all licensed healthcare professionals who falsely purport to own and control the Provider Defendants;

(iii)    Defendants Igor Belyansky ("Belyansky"), Golden Tree SIE LLC ("Golden Tree"), and Irina Barinov ("Barinov"), along with John Doe Defendants 1

4

through 10 (the "John Doe Defendants") (collectively, the "Management Defendants") secretly and unlawfully own, control, and/or derive economic benefit from the Provider Defendants in contravention of New York law. Through their unlawful ownership and/or control of the Provider Defendants, the Management Defendants engaged in unlawful financial arrangements, and caused Insureds to be referred by and amongst the Provider Defendants for the sole purpose of exploiting the Insureds' No-Fault Benefits. The Management Defendants are persons and entities who are not and never have been licensed healthcare professionals.

(iv)    John Doe Defendants 1-10 are unlicensed persons and entities who are presently not identifiable by Liberty Mutual but associated with Belyansky and Barinov, and who unlawfully own and/or control the Provider Defendants, and who have been involved in the fraudulent scheme committed against Liberty Mutual and other New York automobile insurers, along with the other Management Defendants named herein, to maximize profits without regard for genuine patient care.

6.      As discussed below, the Defendants at all relevant times have known that: (i) the Provider Defendants were unlawfully incorporated, owned and controlled by unlicensed laypersons; (ii) the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iii) the codes the Defendants used for purposes of billing the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual; (iv) the Provider Defendants engaged in unlawful financial arrangements with unlicensed individuals and entities, including the Management Defendants, as part of a scheme to defraud New York automobile insurers; and (v) in many instances, the Fraudulent Services were ineligible for payment because they were provided – to the extent provided at all – by independent contractors, rather than by employees of the Provider Defendants.

5

7.     As such, the Defendants do not have any right to be compensated for the Fraudulent Services that have been billed to Liberty Mutual through the Provider Defendants.

8.     The charts annexed hereto as Exhibits "1" – "11" set forth the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to Liberty Mutual.

9.     The Defendants' fraudulent scheme began as early as 2019 and continues uninterrupted through the present day. As a result of the Defendants' scheme, Liberty Mutual has incurred damages of more than $855,000.00.

## THE PARTIES

**I.     Plaintiffs**

10.     Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal place of business in Boston, Massachusetts. Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

11.     Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation, and LM Insurance Corporation are Illinois corporations with their principal place of business in Boston, Massachusetts. Liberty Insurance Corporation, The First Liberty Insurance Corporation, and LM Insurance Corporation are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

12.     Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts. Liberty Mutual Fire Insurance Company

is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

13.     Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts. Liberty County Mutual Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

14.     Plaintiffs LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are Indiana corporations with their principal place of business in Boston, Massachusetts. LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.     **Defendants**

15.     Defendant Goloubenko Medical is a New York professional corporation with its principal place of business in New York.  Goloubenko Meical was incorporated on March 21, 2022 and operated from the Avenue X Clinic.  The Defendants used Goloubenko Medical to submit billing for the Fraudulent Services to automobile insurance companies, including Liberty Mutual.

16.     Defendant Goloubenko resides in and is a citizen of New York. Goloubenko was licensed to practice medicine in New York on December 12, 2003. From October 2021, Goloubenko has served as the nominal owner of his sole proprietorship and also purports to own Goloubenko Medical.

17.     Defendant Amon Chiro is a New York professional corporation with its principal place of business in New York.  Amon Chiro was incorporated on September 4, 2019 and operated

from the Avenue X Clinic. The Defendants used Amon Chiro to submit billing for the Fraudulent Services to automobile insurance companies, including Liberty Mutual.

18.     Defendant Cronos Chiro is a New York professional corporation with its principal place of business in New York.  Cronos Chiro was incorporated on January 13, 2021 and operated from the Avenue X Clinic. The Defendants used Cronos Chiro to submit billing for the Fraudulent Services to automobile insurance companies, including Liberty Mutual.

19.     Defendant Gorelik resides in and is a citizen of New York. Gorelik was licensed to practice chiropractic in New York on January 31, 2001. From October 2020, Gorelik has served as the nominal owner of his sole proprietorship and also purports to own Amon Chiro and Cronos Chiro.  Gorelik is no stranger to No-Fault insurance fraud schemes, having been named as a defendant multiple times by various insurers. See Allstate Ins. Co. et al. v. Zemlyansky et al., 1:12-cv-02303-JBW-RER (E.D.N.Y. 2013); Allstate Ins. Co. et al. v. A & F Medical, P.C., et al., 1:14-cv-06756-ENV-RLM (E.D.N.Y. 2014); Allstate Ins. Co. et al. v. Art of Healing Medicine, P.C., et al., 1:15-cv-03639-ENV-RLM (E.D.N.Y. 2014); Allstate Ins. Co. et al. v. Rose, Sr., et al., 1:22-cv-00279-WFK-MMH (E.D.N.Y. 2022); State Farm Mut. Auto. Ins. Co. v. Fayda et al., 1:14-cv-09792-WHP (S.D.N.Y. 2014); GEICO et al. v. New Beginning Chiropractic, P.C., et al., 1:15-cv-04054-ARR-LB (E.D.N.Y. 2015); American Transit Ins. Co. v. Akpan et al., 1:18-cv-0442-ARR-PK (E.D.N.Y. 2018).

20.     Defendant Priority Care is a New York professional corporation with its principal place of business in New York.  Priority Care was incorporated on July 15, 2009 and operated from the Avenue X Clinic. The Defendants used Priority Care to submit billing for the Fraudulent Services to automobile insurance companies, including Liberty Mutual.

21.     Defendant Bakry resides in and is a citizen of New York. Bakry became licensed to practice physical therapy in New York on July 24, 1998, and purports to own Priority Care.

22.     Defendant County Medical is a New York professional corporation with its principal place of business in New York.  County Medical was incorporated on August 22, 2019 and operated from the Avenue X Clinic. The Defendants used County Medical to submit billing for the Fraudulent Services to automobile insurance companies, including Liberty Mutual.

23.     Defendant Focazio resides in and is a citizen of New Jersey. Focazio became licensed to practice medicine in New York on March 23, 2015, and purports to own County Medical.

24.     Defendant Belyanskaya OT is a New York professional corporation with its principal place of business in New York.  Belyanskaya was incorporated on December 16, 2020 and operated from the Clinics. The Defendants used Belyanskaya OT to submit billing for the Fraudulent Services to automobile insurance companies, including Liberty Mutual.

25.     Defendant Belyanskaya resides in and is a citizen of New York. Belyanskaya became licensed to practice occupational therapy in New York on April 29, 2019, and purports to own Belyanskaya OT.

26.     Defendant Neptune Medical is a New York professional corporation with its principal place of business in New York.  Neptune Medical was incorporated on May 18, 2022 and operated from the Clinics. The Defendants used Neptune Medical to submit billing for the Fraudulent Services to automobile insurance companies, including Liberty Mutual.

27.     Defendant Katz resides in and is a citizen of New York. Katz was licensed to practice medicine in New York on September 22, 2009, and purports to own Neptune Medical.

28. Defendant Best Touch is a New York professional corporation with its principal place of business in New York. Best Touch was incorporated on October 8, 2009 and operated from the Neptune Avenue Clinic. The Defendants used Best Touch to submit billing for the Fraudulent Services to automobile insurance companies, including Liberty Mutual.

29. Defendant Mahmoud resides in and is a citizen of New York. Mahmoud was licensed to practice physical therapy in New York on November 29, 2001, and purports to own Best Touch.

30. Defendants Best Touch and Mahmoud were previously sued for allegations regarding a money laundering scheme in New York involving more than 50 corporate entities. Specifically, Mahmoud and Best Touch, along with a host of other No-Fault healthcare providers, allegedly issued checks to the law firm of Petroff Amshen for "legal services" even though it never provided legal services to Mahmoud and Best Touch, and then they, along with other parties, created false W-9 forms purportedly issued by Petroff Amshen, forged the law firm's signature on checks, and cashed those checks at check-cashing entities, thus converting their ill-gotten gains into liquid assets. See Petroff Amshen LLP v. Alfa Rehab PT, P.C., et al., 1:19-cv-01861-MKB-RML (E.D.N.Y. 2019).

31. Defendant Infinity Medical is a New York professional corporation with its principal place of business in New York. Infinity Medical was incorporated on August 16, 2013 and operated from the Neptune Avenue Clinic. The Defendants used Infinity Medical to submit billing for the Fraudulent Services to automobile insurance companies, including Liberty Mutual.

32. Defendant Raitses resides in and is a citizen of New York. Raitses was licensed to practice medicine in New York on April 20, 2012, and purports to own Infinity Medical.

33.     Defendant Belyansky resides in and is a citizen of New York. Belyansky is not a licensed healthcare professional and at all times has conspired and participated in the fraudulent scheme outlined in this Complaint, including: (i) illegally owning and controlling the Clinics and the Provider Defendants with others, including the Management Defendants; (ii) engaging in illegal financial arrangements; and (iii) establishing and implementing a fraudulent, pre-determined treatment and billing protocol to support the excessive rendering of and billing for the medically unnecessary Fraudulent Services.

34.     Defendant Belyansky is no stranger to healthcare fraud, having been previously named as a defendant based on his involvement in a No-Fault insurance scheme. See Allstate Ins. Co. et al. v. Yuryev, L.Ac., et al., 1:11-cv-05390-MKB-RML (E.D.N.Y. 2011). In addition, Belyansky was indicted for bribing former New York State Assemblyman Eric Stevenson to help open and manage adult day care centers in the Bronx. See U.S.A. v. Stevenson et al., S2 13 Cr. 161 (WHP) (S.D.N.Y. 2013). All defendants named in the indictment were sentenced to federal prison on conspiracy, fraud, and bribery charges.

35.     Defendant Golden Tree is a New York corporation that was incorporated on September 11, 2019, with its principal place of business at 282-284 Avenue X, Brooklyn, New York. Golden Tree is owned and controlled by Belyansky and has been used by the Management Defendants to illegally own and control the Clinics as well as the Provider Defendants, and to siphon insurance profits generated by the Provider Defendants to unlicensed laypersons, including the Management Defendants.

36.     Defendant Barinov resides in and is a citizen of New York. Barinov is not a licensed healthcare professional and at all times has conspired and participated in the fraudulent scheme outlined in this Complaint, including: (i) illegally owning and controlling the Clinics and the

Provider Defendants with others, including the Management Defendants; (ii) engaging in illegal financial arrangements; and (iii) establishing and implementing a fraudulent, pre-determined treatment and billing protocol to support the excessive rendering of and billing for the medically unnecessary Fraudulent Services.

37. Upon information and belief, the John Doe Defendants reside in and are citizens of New York. The John Doe Defendants are individuals and entities, presently not identifiable, who are not and never have been licensed healthcare professionals, yet have illegally owned, controlled, and derived economic benefit from the operation of the Clinics and the Provider Defendants in contravention of New York law, engaged in illegal financial arrangements with the Provider Defendants, and directed the fraudulent, pre-determined treatment and billing protocol at the Clinics.

## JURISDICTION AND VENUE

38. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

39. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

40. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities forming the basis of this Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

41.     Liberty Mutual underwrites automobile insurance in New York.

## I.     An Overview of the No-Fault Laws and Licensing Statutes

42.     New York's No-Fault Laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

43.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

44.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

45.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company within forty-five days of the date of service and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

46.     The No-Fault Laws obligate individuals and healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish proof of their claims.

47.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet New York State or local licensing requirements necessary to provide the underlying services.

48.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

49.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that: (i) healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits; and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed individuals are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

50.     Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

51.     New York law prohibits licensed healthcare providers from paying or accepting payments (i.e., kickbacks) in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

52.     Furthermore, pursuant to Education Law § 6512 and §§ 6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

53.     Pursuant to Education Law § 6509-a, it is professional misconduct under certain circumstances for a licensee to "directly or indirectly" request, receive, or participate in the division, transference, assignment, rebate, splitting, or refunding of a fee. Further, pursuant to 8 N.Y.C.R.R. § 29.1(b)(3), a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services. Pursuant to Education Law § 6530(19), it is professional misconduct under certain circumstances for a licensee to permit any person to share in fees for professional services.

54.     New York law also prohibits anyone from engaging in, for profit, any business or service which in whole or in part includes the referring or recommending of persons to a physician, hospital, health-related facility, or dispensary for any form of medical care or treatment. See New York Public Health Law § 4501. Similarly, no facility delivering healthcare services shall in any manner share fees with a medical referral service. See New York Public Health Law § 2811.

55.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if, among other things, it is unlawfully incorporated, unlawfully licensed, engages in unlawful financial, or pays or receives unlawful kickbacks in exchange for patient referrals.

56.     Furthermore, pursuant to the No-Fault Laws, only healthcare service providers in possession of a direct assignment of benefits are entitled to bill for or collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, provides, in pertinent part, as follows:

> An insurer shall pay benefits for any element of loss … <u>directly</u> to the applicant or, … upon assignment by the applicant … shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law … (emphasis supplied).

57.     For a healthcare service provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, a professional service corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who are not employees of the professional corporation, such as independent contractors.

58.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

59.     When a healthcare service provider submits a claim for No-Fault Benefits using the Current Procedural Terminology ("CPT") Codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT Code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT Code that is used was reasonable and medically necessary; and (iii) the service and attendant fees were not excessive.

60.     Pursuant to N.Y. Ins. Law § 403, all bills submitted by a healthcare service provider to Liberty Mutual and all other insurers must be verified by the healthcare service provider subject to – in substance – the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime ….

## II.   The Defendants' Fraudulent Scheme

### A.   Overview of the Scheme

61.     Beginning in 2019, the Defendants devised and implemented a complex fraudulent scheme in which the Provider Defendants – all which were owned on paper by the Nominal Owner Defendants, but actually unlawfully owned and controlled by the Management Defendants – were used to bill Liberty Mutual and the New York automobile insurance industry for millions of dollars in No-Fault Benefits they were never entitled to receive.

62.     The Defendants used the Avenue X and Neptune Avenue Clinics, both of which were controlled by the Management Defendants, to perpetrate the fraudulent scheme. The Provider Defendants were given access to No-Fault patients on behalf of whom the Defendants were able to bill automobile insurers for the Fraudulent Services using various professional practices.

63.     To effectuate the scheme, the Management Defendants colluded with the Nominal Owner Defendants to unlawfully own and/or control various healthcare practices.   The Management Defendants had the licensed healthcare professionals pose as "sham" owners of those practices, in part, to implement the fraudulent, pre-determined billing and treatment protocols established by the Management Defendants at the Clinics and designed solely to maximize profits without regard to genuine patient care.

64.     Using the Clinics, the Management Defendants' fraudulent scheme included: (i) "purchasing" the licenses of the Nominal Owner Defendants; (ii) using those licenses to illegally incorporate, own, and/or control the Provider Defendants; (iii) engaging in illegal financial arrangements; (iv) implementing a fraudulent, pre-determined treatment and billing protocol designed to maximize profits that the Management Defendants received through the Provider Defendants by subjecting Insureds to the Fraudulent Services; and (v) using the Provider Defendants as conduits to submit fraudulent No-Fault billing to Liberty Mutual and other New York automobile insurers.

65.     The Nominal Owner Defendants did not establish their own practices but rather "entered" into the Clinics with pre-existing patient bases, which were generated and controlled by the Management Defendants. The Nominal Owner Defendants did not advertise or market their services at the Clinics, and did nothing to create a patient base for their alleged professional "practices."

66.     For example, Defendant Gorelik testified during examinations under oath associated with Amon Chiro and Cronos Chiro that he did not undertake any advertising or marketing efforts for either Amon Chiro or Cronos Chiro, and did not maintain a website or social media presence to draw new patients to his practices.

67.     In fact, none of the Provider Defendants have a website or any online presence. Yet, despite their minimal or non-existent marketing efforts, the Provider Defendants were able to bill Liberty Mutual more than $1,200,000.00 in charges for Fraudulent Services allegedly provided to Insureds at the Clinics because they each had a steady flow of patients due to the Management Defendants' improper control and the associated financial arrangements.

68.     The Management Defendants, rather than the Nominal Owner Defendants, created and controlled the Clinics, the Provider Defendants, and the patient base, while concealing themselves as, among other things, office managers or administrators of the Clinics in order to avoid detection of the illegal scheme by insurers, regulators, and law enforcement.

69.     Further, the Nominal Owners were not responsible for, or in control of, coordinating and scheduling the "employees" who worked at the Clinics under the names of the Provider Defendants. In fact, the Management Defendants hired, directed, and supervised these individuals at the Clinics.

70.     For example, Defendant Gorelik testified during the examination under oath associated with Amon Chiro that he employed Defendant Barinov through Cronos Chiro. Gorelik stated that Barinov worked at the front desk of the Avenue X Clinic when he met her. In fact, Barinov arranged to have Gorelik begin providing services at the Clinic, managed the day-to-day operations of the Avenue X Clinic and controlled the operation and management of the practice.

71.     During the examination under oath associated with Amon Chiro, Gorelik also revealed an association with Defendant Belyansky. Notably, Belyansky's company, Golden Tree, is also registered at the Avenue X Clinic address, where two of Gorelik's practices are also located. Like the Provider Defendants, Golden Tree has no online presence and appears to have no legitimate purpose. Further, Golden Tree is directly associated with the Neptune Avenue Clinic based upon, among other evidence, check(s) from a healthcare provider to Golden Tree for rental space at the Neptune Avenue Clinic.

72.     The Management Defendants directed Insureds to treat, or purport to treat, with a variety of transient providers who paid illegal fees to them in order to access the Clinics' patient base to subject Insureds to a host of illusory and medically unnecessary diagnostic tests and

evaluations. These were performed – to the extent performed at all – to allow the Management Defendants to realize additional revenue from the operation and control of the Clinics, and to justify the continued treatment of Insureds with the Provider Defendants so that the Defendants could maximize the billing submitted to Liberty Mutual and exploit Insureds' No-Fault Benefits.

73.     The Management Defendants had ultimate control over the Clinics, deciding: (i) which providers would be given access to the Clinics' patients; (ii) which services would be offered to patients; (iii) the fraudulent, pre-determined treatment protocols that would be implemented at the Clinics; and (iv) the financial arrangements (disguised as rent payments) that would be required of medical providers interested in operating from the Clinics.

74.     Pursuant to the Management Defendants' directive, patients at the Clinics were initially subjected to sham examinations, and, as a result of the phony diagnoses and recommendations listed in the examination reports, were then systematically directed to undergo a course of medically unnecessary and excessive treatment – including diagnostic testing, outcome assessment tests, computerized range of motion and muscle strength tests, activity limitation measurements and physical performance tests, trigger point injections, chiropractic services, physical therapy, and occupational therapy services (i.e., the Fraudulent Services) – with various healthcare providers operating from the Clinics, including the Provider Defendants.

75.     The Clinics, though ostensibly organized to provide a range of healthcare services to Insureds at each location, have at all times been under the control of the Management Defendants, who organized and created them to be convenient, one-stop shops for No-Fault insurance fraud.

76.     The Defendants, for no demonstrable reason other than to avoid detection of the fraudulent scheme while maximizing their likelihood of getting paid by New York automobile

insurers, used both Clinics simultaneously, with some of the Provider Defendants operating from both Clinics in a sequential manner.

77.     For example, Belyanskaya OT commenced providing services at the Neptune Avenue Clinic on June 2, 2021, and continued to purportedly treat Insureds until May 31, 2023. Belyanskaya OT then transitioned to the Avenue X Clinic and commenced billing Liberty Mutual for services purportedly rendered from June 1, 2023, to the present. Neptune Medical provided services at the Neptune Avenue Clinic from June 23, 2022, until May 22, 2023. On June 5, 2023, Neptune Medical commenced providing services at the Avenue X Clinic, and continues to submit billing for services purportedly rendered at that location. Lastly, Gorelik SP provided services at the Avenue X Clinic from October 5, 2020, until May 28, 2021. Gorelik SP then transitioned to the Neptune Avenue Clinic and provided services from June 2, 2021, until May 26, 2022.

78.     The Nominal Owners, at all times, have known that the financial arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent scheme. In fact, the Defendants conducted their scheme through multiple professional practices using different tax identification numbers in order to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number, avoid detection, and thereby perpetrate their fraudulent scheme and increase their ill-gotten gains.

**B.     The Unlawful Ownership and/or Control of the Provider Defendants**

79.     At all relevant times herein, the Management Defendants controlled the Clinics, and unlawfully owned and controlled the healthcare practices operating within the Clinics, including the Provider Defendants. The Nominal Owner Defendants were all recruited at one time or another by the Management Defendants to serve as the "sham" owners of the Provider Defendants.

80.     The Nominal Owner Defendants and the Provider Defendants relied on the Management Defendants for access to patients at the Clinics. Indeed, the Nominal Owners knew and understood that they could gain access to these Clinics and their steady stream of patients only if they agreed to enter into unlawful financial arrangements with the Management Defendants and other laypersons supplying patients to the Clinics.

81.     For example, the Provider Defendants simply appeared at the Clinics and immediately began treating, or purporting to treat, patients under the direction and control of the Management Defendants. The Management Defendants ensured that patients would be cultivated and waiting to be "treated" under the names of the Provider Defendants, without any effort by the Nominal Owner Defendants.

82.     Both Clinics served as a "revolving door" for various putative healthcare practices, which opened and closed periodically in an effort to avoid detection of the fraudulent scheme by insurers. Accordingly, the Provider Defendants would cease its operations at one of the Clinics, and the Management Defendants would often simply replace that provider with a new provider of the same type, who would then proceed to seamlessly "treat" that Clinic's existing patients under the direction and control of the Management Defendants and pursuant to the fraudulent, pre-determined protocol.

83.     The Management Defendants established this protocol in order to bill for voluminous, unnecessary, and excessive treatments that were provided (or purported to be provided) regardless of the actual medical needs of each individual Insured. In addition, the results of the Fraudulent Services virtually always supported continued performance of various treatments by the Provider Defendants.

84.     The Management Defendants' decision-making authority relating to the operation and management of the Clinics as well as the Provider Defendants included control over what treatment, testing, and other services the Insureds received, the scope of the referrals and prescriptions for goods and/or services issued to Insureds, and which healthcare provider or professional corporation would render or provide those services.

85.     The Management Defendants' decision-making authority also included (i) control over how the Fraudulent Services were billed to insurers, including Liberty Mutual, (ii) who performed the billing services on behalf of the Clinics, and (iii) how the profits of the Provider Defendants were to be divided and dispersed.

86.     The Management Defendants concealed their involvement through individual "sham" agreements with each of the Provider Defendants.

87.     The individual agreements and financial arrangements with the Provider Defendants were each not reflective of fair market value or the actual value of the services provided, if any, and when totaled among all of the Provider Defendants, were the vehicle to illegally profit from professional medical services and unlawfully funnel large sums of money to themselves in contravention of New York law.

88.     As more fully described in this Complaint, the Management Defendants caused the following Defendants to be established at the Clinics during the following years:

| Year | Avenue X Clinic | Neptune Avenue Clinic |
| --- | --- | --- |
| 2019 | County Medical (Focazio) | |
| 2020 | Priority Care (Bakry)<br>Gorelik SP | |
| 2021 | Amon Chiro (Gorelik)<br>Cronos Chiro (Gorelik)<br>Goloubenko SP | Infinity Medical (Raitses)<br>Belyanskaya OT<br>Gorelik SP |
| 2022 | Goloubenko Medical | Neptune Medical (Katz) |
| 2023 | Belyanskaya OT | Best Touch (Mahmoud) |

Neptune Medical (Katz)

### i.     The Fraudulent Ownership and/or Control of County Medical

89.     As an initial step in their fraudulent scheme, the Management Defendants commenced a search for a licensed medical professional who would be willing to "sell" the use of his/her medical license to the Management Defendants so that the Management Defendants could illegally operate and control a medical practice for the purpose of submitting fraudulent No-Fault billing to New York No-Fault insurers, as well as to issue referrals and/or prescriptions to Insureds for additional healthcare services that would then be performed by the other Provider Defendants.

90.     In or about 2019, the Management Defendants recruited Focazio, a licensed physician who was willing to "sell" the Management Defendants the use of his medical license so that the Management Defendants could unlawfully control County Medical and use that entity as the primary medical practice at the Avenue X Clinic.

91.     Focazio was receptive to the Management Defendants unlawfully operating County Medical.  This was not the first time that he allowed laypersons to control one of his medical practices. For example, Focazio and a professional corporation he purportedly "owned" were previously sued for allegations that his professional corporation was illegally owned and controlled by unlicensed laypersons, provided medically unnecessary healthcare services pursuant to a fraudulent, pre-determined protocol controlled and directed by the unlicensed laypersons, and that Focazio engaged in illegal kickback and financial arrangements with the unlicensed laypersons. See GEICO et al. v. Zaitsev et al., 1:20-cv-03495-FB-SJB (E.D.N.Y. 2020).

92.     Although Focazio was listed as the owner of record of County Medical on the Certificate of Incorporation, Focazio exercised no legitimate ownership of the professional corporation or the profits that were generated from County Medical. Rather, the day-to-day

24

operations, supervisory control, and true ownership of County Medical rested entirely with Management Defendants.

93.     In order to circumvent New York law and to induce the New York State Education Department ("Education Department") to issue certificates of authority authorizing County Medical to operate as a medical practice, the Management Defendants entered into a secret scheme with Focazio.

94.     In exchange for a designated salary or other form of compensation from the Management Defendants, Focazio agreed to falsely represent in the Certificate of Incorporation and related filings with New York State that he was the true shareholder, director, and officer of County Medical and that he truly owned, controlled, and practiced through the professional corporation, even though Focazio knew the professional corporation would be used to submit fraudulent billing to insurers.

95.     Focazio ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

96.     The Management Defendants – rather than Focazio – provided all start-up costs and investment associated with County Medical. Indeed, Focazio did not incur any costs to establish the County Medical practice, nor did he invest any money in the professional corporation he purportedly owned.

97.     The Management Defendants caused County Medical to commence operations at the Avenue X Clinic – a location that the Management Defendants controlled through Golden Tree – alongside other professional corporations they controlled or would come to control at the Avenue X Clinic.

98.     Focazio was never the true shareholder, director, or officer of County Medical, and he never had any true ownership interest in or control over the professional corporation.

99.     True ownership of and control over County Medical always rested entirely with the Management Defendants, who used the facade of County Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

100.    All decision-making authority relating to the operation and management of County Medical was vested entirely with the Management Defendants.

101.    In addition, Focazio never controlled or maintained any of County Medical's books or records, including its bank account(s); never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of County Medical's financial affairs; never hired or supervised any of County Medical's employees or independent contractors; and was completely unaware of the most fundamental aspects of how County Medical operated.

102.    Focazio had no genuine involvement in managing his purported "practice" operating at the Avenue X Clinic. Rather, Focazio was never anything more than a de-facto employee of the Management Defendants.

103.    By contrast, the extent to which the Management Defendants managed and controlled County Medical allowed them to maintain total control over County Medical, the accounts receivable, and any revenues that might be generated therefrom, all while concealing their illegal ownership of and control over County Medical.

104.    County Medical was used as a vehicle by the Management Defendants to unlawfully funnel large sums of money to themselves in contravention of New York law.

105.     The Defendants' scheme not only unlawfully enriched the Management Defendants, but also compromised patient care as County Medical was subject to the pecuniary interests of non-physicians as opposed to the independent medical judgment of true physician-owners.

### ii.     The Fraudulent Ownership and/or Control of Goloubenko SP and Goloubenko Medical

106.     In late 2021, the Management Defendants recruited Goloubenko, a licensed physician who was willing to "sell" them the use of his medical license so that the Management Defendants could illegally use Goloubenko's personal tax identification number, i.e., the Goloubenko SP, to submit fraudulent No-Fault billing to New York No-Fault insurers. The Management Defendants needed a new physician to continue their scheme at the Avenue X Clinic because County Medical ceased operations.

107.     Goloubenko exercised no control over the treatments rendered or the profits that were generated from the Goloubenko SP. Rather, the day-to-day operations, supervisory control, and true ownership of the Goloubenko SP rested entirely with the Management Defendants.

108.     Once the Goloubenko SP began treating Insureds at the Avenue X Clinic in October of 2021, Goloubenko ceded true beneficial control over his sole proprietorship to the Management Defendants.

109.     Since October of 2021, all decision-making authority relating to the operation and management of the Goloubenko SP was vested entirely with the Management Defendants.

110.     Goloubenko never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the Goloubenko SP's financial affairs after ceding control over Goloubenko SP to the Management Defendants.

111.    In addition, Goloubenko did not exercise control over the bills and treatment reports that were submitted under his name.

112.    The Goloubenko SP continued to provide medical services until the Management Defendants unlawfully established Goloubenko Medical at the Avenue X Clinic.

113.    In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Goloubenko, wherein, in exchange for a designated salary or other form of compensation, Goloubenko agreed to falsely represent in the Certificate of Incorporation and related filings with New York State that he was the true shareholder, director, and officer of Goloubenko Medical and that he truly owned, controlled, and practiced through the professional corporation.

114.    Similar to Focazio, Goloubenko agreed to falsely represent in the Certificate of Incorporation and related filings with New York State that he was the true shareholder, director, and officer of Goloubenko Medical and that he truly owned, controlled, and practiced through the professional corporation, knowing that the professional corporation would be used to submit fraudulent billing to insurers.

115.    The Management Defendants – rather than Goloubenko – provided all costs associated with setting up Goloubenko Medical at the Avenue X Clinic as well as all investment in Goloubenko Medical. As with Focazio, Goloubenko did not incur any costs to establish the Goloubenko Medical practice, nor did he invest any money in the professional corporation he purportedly owned.

116.    As a result, Goloubenko was not the true shareholder, director, or officer of Goloubenko Medical, and had no true ownership interest in or control over the professional

corporation. In fact, true ownership of and control over Goloubenko Medical always rested entirely with the Management Defendants, who used the facade of Goloubenko Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

117.    All decision-making authority relating to the operation and management of Goloubenko Medical was vested entirely with the Management Defendants since its incorporation.

118.    In addition, Goloubenko never controlled or maintained any of Goloubenko Medical's books or records, including its bank account(s); never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Goloubenko Medical's financial affairs; and was completely unaware of the most fundamental aspects of how Goloubenko Medical operated.

119.    Goloubenko had no genuine involvement in managing his purported "practices" operating at the Avenue X Clinic. In reality, Goloubenko was never anything more than a de facto employee of the Management Defendants.

120.    The Goloubenko SP and Goloubenko Medical were used as vehicles by the Management Defendants to unlawfully split fees and funnel large sums of money to themselves in contravention of New York law.

121.    The Defendants' scheme not only unlawfully enriched the Management Defendants, but also compromised patient care as the Goloubenko SP and Goloubenko Medical were subject to the pecuniary interests of non-physicians as opposed to the independent medical judgment of true doctor-owners.

### iii.     The Unlawful Ownership and/or Control of Infinity Medical

122.     As a further step in their fraudulent scheme, the Management Defendants sought to establish an additional medical clinic and continue illegally operating and controlling additional practices for the purpose of submitting further fraudulent No-Fault billing to New York No-Fault insurers.

123.     Thus, in June 2021, the Management Defendants recruited Raitses, a licensed physician who was willing to "sell" them the use of her medical license so that the Management Defendants could unlawfully operate and control Infinity Medical and use that entity as the main medical practice at the Neptune Avenue Clinic.

124.     In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Raitses. In exchange for a designated salary or other form of compensation, Raitses agreed to falsely represent to insurers that she truly owned, controlled, and practiced through the professional corporation, even though Raitses knew that the professional corporation would be used to submit fraudulent billing.

125.     The Management Defendants – rather than Raitses – provided all costs associated with establishing Infinity Medical at the Neptune Avenue Clinic. As with Focazio and Goloubenko, Raitses did not incur any costs or invest any money to establish the Infinity Medical practice at the Neptune Avenue Clinic.

126.     Raitses was not the true shareholder, director, or officer of Infinity Medical, and had no true ownership interest in or control over the professional corporation since June 2021. In fact, true ownership of and control over Infinity Medical rested entirely with the Management Defendants, who used the facade of Infinity Medical to do indirectly what they were forbidden

from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

127.   All decision-making authority relating to the operation and management of Infinity Medical was vested entirely with the Management Defendants since June 2021.

128.   In addition, since June 2021, Raitses never controlled or maintained any of Infinity Medical's books or records, including its bank account(s); never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Infinity Medical's financial affairs; and was completely unaware of the most fundamental aspects of how Infinity Medical operated.

129.   Raitses had no genuine involvement in managing her purported "practice" operating at the Neptune Avenue Clinic since ceding true beneficial ownership and control over the professional corporation to the Management Defendants in June 2021. In reality, Raitses was never anything more than a de-facto employee of the Management Defendants.

130.   Infinity Medical was used as a vehicle by the Management Defendants to unlawfully split fees and funnel large sums of money to themselves in contravention of New York law.

131.   The Defendants' scheme not only unlawfully enriched the Management Defendants, but also compromised patient care as Infinity Medical was subject to the pecuniary interests of non-physicians as opposed to the independent medical judgment of true doctor-owners.

### iv.   The Unlawful Ownership and/or Control of Neptune Medical

132.   In mid-2022, the Management Defendants recruited Katz, a licensed physician who was willing to "sell" them the use of his medical license so that the Management Defendants could unlawfully incorporate, operate and/or control Neptune Medical and use that entity as the primary

medical practice at the Neptune Avenue Clinic, particularly because Infinity Medical ceased operations only eight days before Neptune Medical commenced the performance of medical services there. Indeed, the Management Defendants wasted no time in locating a new physician to continue their fraudulent scheme at the Neptune Avenue Clinic.

133.    Similar to Focazio and Goloubenko, Katz agreed, in exchange for a designated salary or other form of compensation, to falsely represent in the Certificate of Incorporation and related filings with New York State that he was the true shareholder, director, and officer of Neptune Medical and that he truly owned, controlled, and practiced through the professional corporation, even though Katz knew that the professional corporation would be used to submit fraudulent billing to insurers.

134.    The Management Defendants – rather than Katz – provided all costs associated with setting up Neptune Medical at the Neptune Avenue Clinic as well as all investment in Neptune Medical. As with Focazio and Goloubenko, Katz did not incur any costs to establish the Neptune Medical practice, nor did he invest any money in the professional corporation he purportedly owned.

135.    Katz was not the true shareholder, director, or officer of Neptune Medical, and had no true ownership interest in or control over the professional corporation. In fact, true ownership of and control over Neptune Medical always rested entirely with the Management Defendants who used the facade of Neptune Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

136.    All decision-making authority relating to the operation and management of Neptune Medical was vested entirely with the Management Defendants.

137.    In addition, Katz never controlled or maintained any of Neptune Medical's books or records, including its bank account(s); never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Neptune Medical's affairs; never hired or supervised any of Neptune Medical's employees or independent contractors; and was completely unaware of the most fundamental aspects of how Neptune Medical operated.

138.    Katz had no genuine involvement in managing his purported "practice" operating at the Neptune Avenue Clinic.

139.    Furthermore, in or around June of 2023, the Management Defendants caused Neptune Medical to move operations to the Avenue X Clinic – a location they also controlled – alongside other professional corporations they controlled or would come to control at the Avenue X Clinic. The Management Defendants facilitated this move in order to continue their fraudulent scheme at the Avenue X Clinic with a new physician.

140.    Katz also had no genuine involvement in managing his purported "practice" while operating from the Avenue X Clinic.

141.    By contrast, the extent to which the Management Defendants managed and controlled Neptune Medical allowed them to maintain total control over Neptune Medical, the accounts receivable, and any revenues that might be generated therefrom, all while concealing their illegal ownership of and control over Neptune Medical.

142.    Neptune Medical was used as a vehicle by the Management Defendants to unlawfully split fees and funnel large sums of money to themselves in contravention of New York law.

143.    The Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as Neptune Medical was subject to the pecuniary interests of non-physicians as opposed to the independent medical judgment of true doctor-owners.

    **v.    The Unlawful Ownership and/or Control of the Chiropractic Professional Practices**

144.    The Management Defendants continued their fraudulent scheme by recruiting a licensed chiropractic professional who was willing to "sell" the use of his professional license to the Management Defendants so that the Management Defendants could unlawfully operate and control a series of chiropractic professional corporations under the chiropractor's name, as well as his sole proprietorship.

145.    In 2020, the Management Defendants recruited Gorelik, a licensed chiropractor who was willing to "sell" the Management Defendants the use of his chiropractic license so that the Management Defendants could illegally use Gorelik's personal tax identification number, i.e., the Gorelik SP, to submit fraudulent No-Fault billing to New York No-Fault insurers.

146.    Gorelik exercised no control over the treatments rendered or the profits that were generated from the Gorelik SP. Rather, the day-to-day operations, supervisory control, and true ownership of the Gorelik SP rested entirely with the Management Defendants.

147.    Once the Gorelik SP began treating Insureds at the Avenue X Clinic in December 2020, Gorelik ceded true beneficial control over his practice to the Management Defendants.

148.    Since December of 2020, all decision-making authority relating to the operation and management of the Gorelik SP was vested entirely with the Management Defendants.

149.    Gorelik never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the Gorelik SP's financial affairs; and never hired or

supervised any of the Gorelik SP's employees or independent contractors after ceding control over the Gorelik SP to the Management Defendants in December 2020.

150.    In addition, Gorelik did not exercise control over the bills and treatment reports that were submitted under his name.

151.    The Gorelik SP continued to provide services at the Avenue X Clinic until May 2021. Thereafter, in or around June 2021, the Management Defendants caused Gorelik SP to move operations to the Neptune Avenue Clinic – a location they also controlled – alongside other professional corporations they controlled or would come to control at the Neptune Avenue Clinic. The Management Defendants facilitated this move in order to expand their fraudulent scheme at the Neptune Avenue Clinic with a chiropractor.

152.    Furthermore, in April 2021, a few months prior to the Gorelik SP's transition to the Neptune Avenue Clinic, the Management Defendants unlawfully established Cronos Chiro at the Avenue X Clinic. Then, in December of 2021, the Management Defendants unlawfully established Amon Chiro at the Avenue X Clinic. The Management Defendants used both professional chiropractic corporations to submit billing for the Fraudulent Services to Liberty Mutual. Gorelik was receptive to the Management Defendants unlawfully operating two of his professional corporations since they have previously done so with the Gorelik SP.

153.    Although Gorelik was listed as the owner of record of Amon Chiro and Cronos Chiro on the Certificates of Incorporation, Gorelik exercised no ownership or control over the treatments rendered or the profits that were generated from the two professional chiropractic corporations since ceding control over them to the Management Defendants. Rather, the day-to-day operations, supervisory control, and true ownership of Amon Chiro and Cronos Chiro rested entirely in the hands of the Management Defendants.

154.    In order to circumvent New York law preventing non-chiropractic professionals from owning and controlling chiropractic professional corporations, the Management Defendants entered into a secret scheme with Gorelik, wherein, in exchange for a designated salary or other form of compensation, Gorelik agreed to falsely represent to insurers that he truly owned, controlled, and practiced through the professional corporations, despite Gorelik knowing that the professional corporations would be used to submit fraudulent billing to insurers.

155.    The Management Defendants – rather than Gorelik – provided all costs associated with setting up Amon Chiro and Cronos Chiro, and arranged for the professional chiropractic corporations to gain access to patients at the Avenue X Clinic. Gorelik did not incur any costs to establish the Amon Chiro and Cronos Chiro practices at the Avenue X Clinic, nor did he invest any money in Amon Chiro and Cronos Chiro after ceding control over them to the Management Defendants in 2021.

156.    Gorelik was not the true shareholder, director, or officer of Amon Chiro or Cronos Chiro and he did not have any true ownership interest in or control over the professional corporations since 2021. In fact, true ownership of and control over Amon Chiro and Cronos Chiro rested entirely with the Management Defendants, who used the facade of Amon Chiro and Cronos Chiro to do indirectly what they were forbidden from doing directly, namely: (i) employ chiropractic professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

157.    Following Gorelik's decision to cede control of the professional corporations to the Management Defendants, he exercised absolutely no control over or had any ownership interest in Amon Chiro and Cronos Chiro, and all decision-making authority relating to the operation and

management of the professional chiropractic corporations was vested entirely with the Management Defendants.

158.    In addition, subsequent to the purchase of his chiropractic license by the Management Defendants, Gorelik did not control or maintain any of Amon Chiro and Cronos Chiro's books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any of the professional chiropractic corporations' financial affairs; never hired or supervised any of Amon Chiro and Cronos Chiro's employees; and was unaware of the fundamental aspects of how Amon Chiro and Cronos Chiro operated.

159.    In reality, Gorelik was never anything more than a de-facto employee of the Management Defendants.

160.    The Gorelik SP, Amon Chiro, and Cronos Chiro were used as vehicles by the Management Defendants to unlawfully funnel large sums of money to themselves in contravention of New York law.

161.    The Defendants' scheme not only unlawfully enriched the Management Defendants, but compromised patient care as the Gorelik SP, Amon Chiro, and Cronos Chiro were subject to the pecuniary interests of non-chiropractors as opposed to the independent medical judgment of true chiropractor-owners.

> **vi.    The Unlawful Ownership and/or Control of the Physical Therapy and Occupational Therapy Professional Corporations**

162.    The Management Defendants also expanded their fraudulent scheme by recruiting licensed physical therapy and occupational therapy professionals who were willing to "sell" the use of their professional licenses to the Management Defendants so that the Management Defendants could unlawfully incorporate, operate, and/or control a series of physical therapy and

occupational therapy professional corporations under the physical therapy and occupational therapy professionals' names.

163.    Beginning in 2020, the Management Defendants recruited Bakry, Belyanskaya, and Mahmoud, licensed physical therapy and/or occupational therapy professionals who were willing to "sell" the Management Defendants the use of their professional licenses so that the Management Defendants could unlawfully operate and/or control Priority Care, Belyanskaya OT, and Best Touch, respectively.

164.    Specifically, in 2020, the Management Defendants recruited Bakry, a licensed physical therapist who was willing to "sell" them the use of his physical therapy license so that the Management Defendants could unlawfully operate and control Priority Care at the Avenue X Clinic. The Management Defendants used Priority Care to submit billing for the Fraudulent Services to Liberty Mutual. Along similar lines, Bakry was listed as the treating provider on several bills submitted to Liberty Mutual by various professional corporations, including County Medical and Best Touch.

165.    In mid-2021, the Management Defendants recruited Belyanskaya, a licensed occupational therapist who was willing to "sell" them the use of her occupational therapy license so that the Management Defendants could unlawfully operate and/or control Belyanskaya OT at the Avenue X Clinic and thereafter at the Neptune Avenue Clinic. The Management Defendants used Belyanskaya OT to submit billing for the Fraudulent Services to Liberty Mutual.

166.    In mid-2023, the Management Defendants recruited Mahmoud, a licensed physical therapist who was willing to "sell" them the use of his physical therapy license so that the Management Defendants could unlawfully operate and control Best Touch at the Neptune Avenue

Clinic. The Management Defendants used Best Touch to submit billing for the Fraudulent Services to Liberty Mutual.

167.   In order to circumvent New York law preventing non-physical therapy and non-occupational therapy professionals from owning and controlling physical therapy and occupational therapy professional corporations, the Management Defendants entered into schemes with Bakry, Belyanskaya, and Mahmoud. In exchange for a designated salary or other form of compensation, Belyanskaya agreed to falsely represent in the Certificates of Incorporation and related filings with New York State that she was the true shareholder, director, and officer of Belyanskaya OT, and that she truly owned, controlled, and practiced through the professional corporation, despite knowing that her professional corporation would be used to submit fraudulent billing to insurers.

168.   Along similar lines, in exchange for a designated salary or other form of compensation, Bakry and Mahmoud agreed to falsely represent to insurers that they truly owned, controlled, and practiced through Priority Care and Best Touch, respectively, despite knowing that the professional corporations would be used to submit fraudulent billing to insurers.

169.   The Management Defendants – rather than Bakry, Belyanskaya, and Mahmoud – provided all costs associated with setting up Priority Care, Belyanskaya OT, and Best Touch at the Clinics as well as all investment in Belyanskaya OT. Bakry, Belyanskaya, and Mahmoud did not incur any costs to establish their respective professional practices at the Clinics, nor did they invest any money in the professional corporations after ceding control over them to the Management Defendants.

170.   Bakry, Belyanskaya, and Mahmoud were not the true shareholders, directors, or officers of Priority Care, Belyanskaya OT, and Best Touch and they had no true ownership interest in or control over the professional corporations. In fact, true ownership and control over the

professional corporations rested entirely with the Management Defendants, who used the facade of Priority Care, Belyanskaya OT, and Best Touch to do indirectly what they were forbidden from doing directly, namely: (i) employ physical therapy and occupational therapy professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

171.    Following Bakry, Belyanskaya, and Mahmoud's decision to cede control of the professional corporations to the Management Defendants, they exercised absolutely no control over or ownership interest in Priority Care, Belyanskaya OT, and Best Touch, and all decision-making authority relating to the operation and management of the professional corporations was vested entirely with the Management Defendants.

172.    In addition, subsequent to the purchase of their physical therapy and/or occupational therapy licenses by the Management Defendants, Bakry, Belyanskaya, and Mahmoud did not control or maintain any of Priority Care, Belyanskaya OT, and Best Touch's books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the professional corporations' financial affairs; never hired or supervised any of Priority Care, Belyanskaya OT, and Best Touch's employees; and were unaware of the fundamental aspects of how the professional corporations operated.

173.    In reality, Bakry, Belyanskaya, and Mahmoud were never anything more than de facto employees of the Management Defendants.

174.    Priority Care, Belyanskaya OT, and Best Touch were used as vehicles by the Management Defendants to unlawfully funnel large sums of money to themselves in contravention of New York law.

175.    The Defendants' scheme not only unlawfully enriched the Management Defendants, but also compromised patient care as Priority Care, Belyanskaya OT, and Best Touch were subject to the pecuniary interests of unlicensed persons as opposed to the independent medical judgment of true licensed healthcare professionals owners.

### C.    The Management Defendants' Efforts to Conceal Their Ownership and Control of the Provider Defendants Through Sham Financial Arrangements

176.    To conceal their illegal referral and financial relationships while simultaneously effectuating pervasive, total control over the Provider Defendants' operation and management, the Management Defendants arranged to have the Nominal Owner Defendants and the Provider Defendants enter into "management," "billing," "collection," "lease," and/or "marketing" agreements or other financial arrangements in order to conceal the Management Defendants' true ownership of the Provider Defendants.

177.    These illicit agreements or financial arrangements called for payments that were purportedly for the performance of certain designated services including management, billing, collection, leasing, marketing, etc., but were in actuality: (i) sham agreements and arrangements; (ii) not reflective of the fair market value or the actual value of the services provided; and (iii) decoys to conceal the Management Defendants' illegal ownership of and control over the Provider Defendants.

178.    In fact, the agreements and financial arrangements were created, dictated, and imposed by the Management Defendants upon the Provider Defendants to present the illusion that the Provider Defendants were paying legitimate fees for "management," "billing," "collection," and "marketing" services, and/or for facility space and equipment, but they were actually used solely as a tool to permit the Management Defendants to: (i) illegally own, exercise supervisory control over, and direct the day-to-day operations of the Provider Defendants; and (ii) to siphon

all of the profits that were generated by the billing submitted to Liberty Mutual and other insurers through the Provider Defendants.

179.    The net effect of these "management," "billing," "collection," "marketing," "lease," and/or other financial arrangements was to maintain the Provider Defendants in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporations and healthcare practices, their accounts receivable, and all revenues generated therefrom.

180.    The Management Defendants used each of the Provider Defendants as "vessels" so that they could illegally profit from the Fraudulent Services and unlawfully funnel large sums of money to themselves in contravention of New York law.

**D.      The Fraudulent Treatment and Billing Protocol**

181.    The Defendants, using a fraudulent, pre-determined treatment and billing protocol, executed a complex fraudulent scheme designed to bill Liberty Mutual and the New York automobile insurance industry for the performance of the Fraudulent Services.

182.    The Provider Defendants, in accordance with the Management Defendants' fraudulent, pre-determined treatment and billing protocol, subjected Insureds to a myriad of illusory and medically unnecessary healthcare services.

183.    The Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" – regardless of the severity of the accidents or the nature of the Insureds' injuries (or lack thereof) – that was provided pursuant to a fraudulent, pre-determined protocol designed to maximize the billing that Defendants could submit to insurers, including Liberty Mutual, rather than to treat or otherwise benefit the Insureds who were subjected to it.

184.    As part of the scheme, the Defendants purported to subject the Insureds to medically unnecessary "testing" that was provided without regard for the Insureds' individual symptoms or presentment, or absence of any actual medical problems arising from any actual automobile accidents.

185.    Each step in the fraudulent testing and treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent No-Fault billing submitted for each Insured.

186.    Patients purportedly underwent an initial examination, and, as a result, each patient was diagnosed with conditions that varied little, with the examining provider consistently concluding that the same pre-determined, excessive, and unnecessary treatment was medically necessary for each patient. The examinations invariably led to diagnostic testing, voluminous physical therapy treatments, chiropractic services, and occupational therapy treatments.

187.    Further evidence of the fraudulent, pre-determined protocol at the Clinics is the fact that according to reports and notes submitted by the Provider Defendants, Insureds saw only minor improvements in their conditions and pain levels despite receiving numerous different treatments from the Provider Defendants over the course of several months. For example, notes submitted with bills from the Gorelik SP, Cronos Chiro, Priority Care, and Best Touch routinely listed similar, relatively unchanged pain levels for a patient during each visit over the course of their treatment with one of the Provider Defendants. This lack of improvement allowed the Defendants to continue to bill Liberty Mutual for additional visits and services in furtherance of their fraudulent scheme.

43

188.   No legitimate medical professional would have permitted the fraudulent, pre-determined treatment and billing protocol described below to proceed under his or her auspices.

189.   The Defendants permitted the protocol to proceed because they sought to profit from the fraudulent billing submitted to Liberty Mutual and other insurers. Indeed, the core of the Defendants' scheme was to cause Insureds to be subjected to medically unnecessary examinations and treatments pursuant to a fraudulent, pre-determined protocol designed solely to increase revenue and generate profits without regard for genuine patient care.

### i.    The Fraudulent Initial Examinations

190.   Defendants purported to provide virtually every Insured with an initial examination.

191.   In keeping with the fact that the initial examinations were: (i) medically unnecessary; and (ii) performed pursuant to the Defendants' fraudulent, pre-determined treatment protocol and improper financial arrangements, the Provider Defendants virtually always purported to perform the initial examinations or consultations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

192.   The initial examinations were performed as a "gateway" in order to provide Insureds with an excessive number of phony, pre-determined "diagnoses" to allow the Defendants to then purport to provide medically unnecessary, illusory, or otherwise non-reimbursable services.

193.   Typically, Goloubenko Medical, Goloubenko, County Medical, Focazio, Neptune Medical, Katz, Infinity Medical, and Raitses (collectively, the "Examination Defendants") purported to provide the initial examinations at the Clinics.

194. The Examination Defendants typically billed Liberty Mutual for the initial examinations under CPT Codes 99203, 99204, and 99205, resulting in charges ranging from $104.08 to $203.76.

195. The charges for the initial examinations were fraudulent in that the examinations or consultations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the fraudulent, pre-determined treatment protocol established by the Management Defendants and their illegal financial arrangements, not to treat or otherwise benefit the Insureds.

196. Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the nature and extent of the initial examinations.

197. According to the New York Workers' Compensation Medical Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT Code 99205 typically requires that the physician spend at least 60 minutes of face-to-face time with the Insured or the Insured's family.

198. Along similar lines, the use of CPT Code 99204 typically requires that the physician spend at least 45 minutes of face-to-face time with the Insured or the Insured's family.

199. In addition, the use of CPT Code 99203 typically requires that the physician spend at least 30 minutes of face-to-face time with the Insured or the Insured's family.

200. Though the Examination Defendants routinely billed for the initial examinations under CPT Codes 99203, 99204, or 99205, no physician associated with the Examination Defendants ever spent 30 minutes of face-to-face time with the Insureds or their families during the initial examinations, much less 45 minutes or 60 minutes. Rather, the initial examinations rarely lasted more than 20 minutes, to the extent that they were conducted at all.

201.    In keeping with the fact that the initial examinations rarely lasted at least 20 minutes, much less 30, 45, or 60 minutes, the Examination Defendants used boilerplate forms in documenting the initial examinations, setting forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

202.    All that was required to complete the boilerplate forms was a brief patient interview and a cursory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

203.    These interviews and examinations did not require any physician associated with the Examination Defendants to spend more than 20 minutes of face-to-face time with the Insureds, let alone 30, 45, or 60 minutes.

204.    Furthermore, according to the Fee Schedule, the use of CPT Codes 99203, 99204, and 99205 typically requires that the Insured presented with problems of moderate to high severity.

205.    Though the Examination Defendants routinely billed for the initial examinations under CPT Codes 99203, 99204, or 99205, the Insureds did not present with problems of moderate to high severity as the result of any automobile accidents. Rather, to the extent that the Insureds had any health problems at all as a result of any automobile accidents, the problems almost always were of low severity.

206.    What is more, even though the Insureds almost never presented with problems of moderate to high severity as the result of any automobile accidents, in the unlikely event that an Insured was to present with problems of moderate to high severity, the deficient initial examinations were incapable of assessing and/or diagnosing problems of such severity.

207.     In addition, according to the Fee Schedule, when the Examination Defendants submitted charges for initial examinations under CPT Codes 99203 or 99204, they represented that they: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

208.     Further, according to the Fee Schedule, when the Examination Defendants submitted charges for initial examinations under CPT Code 99205, they represented that they: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity."

(a) <u>Misrepresentations Regarding "Comprehensive" Patient Histories</u>

209.     Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

210.     Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

211.     The CPT Assistant recognizes the following organ systems with respect to a review of systems:

> (i)      constitutional systems (<u>e.g.</u>, fever, weight loss);
>
> (ii)     eyes;
>
> (iii)    ears, nose, mouth, throat;
>
> (iv)     cardiovascular;
>
> (v)      respiratory;

47

    (vi)    gastrointestinal;

    (vii)    genitourinary;

    (viii)    musculoskeletal;

    (ix)    integumentary (skin and/or breast);

    (x)    neurological;

    (xi)    psychiatric;

    (xii)    endocrine;

    (xiii)    hematologic/lymphatic; and

    (xiv)    allergic/immunologic.

212.    When the Examination Defendants billed for the initial examinations under CPT Codes 99203, 99204, or 99205, they falsely represented that a physician associated with the Examination Defendants took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

213.    In fact, neither Goloubenko, Focazio, Katz, Raitses, nor any other healthcare provider associated with the Examination Defendants ever took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations because they did not document a review of 10 organ systems unrelated to the history of the patients' present illnesses.

214.    Rather, after purporting to provide the initial examinations, the Examination Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

215.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, but instead were designed solely to support the laundry list of Fraudulent Services that the Defendants purported to provide and then billed to Liberty Mutual and other insurers.

(b) <u>Misrepresentations Regarding "Comprehensive" Physical Examinations</u>

216.     Moreover, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

217.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)       at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)      the general appearance of the patient – <u>e.g.</u>, development, nutrition, body habits, deformities, and attention to grooming;

(iii)     examination of the peripheral vascular system by observation (<u>e.g.</u>, swelling, varicosities) and palpation (<u>e.g.</u>, pulses, temperature, edema, tenderness);

(iv)      palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)       examination of gait and station;

(vi)      examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)     inspection and palpation of skin and subcutaneous tissue (<u>e.g.</u>, scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and

(ix)      mental status, including orientation to time, place and person, as well as mood and affect.

218.   When the Examination Defendants billed for the initial examinations under CPT Codes 99203, 99204, or 99205, they falsely represented that Goloubenko, Focazio, Katz, Raitses, or another physician associated with the Examination Defendants performed a "comprehensive" physical examination of the Insureds they purported to treat during the initial examinations.

219.   In fact, no physician associated with the Examination Defendants ever conducted a general examination of multiple patient organ systems or conducted a complete examination of a single patient organ system.

220.   For instance, neither Goloubenko, Focazio, Katz, Raitses, nor any other healthcare provider associated with the Examination Defendants ever conducted a general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

221.   Furthermore, although the Examination Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial examinations, the musculoskeletal examinations did not qualify as "complete" because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

50

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

222.    What is more, the billing and supporting documentation submitted through Neptune Medical seeking reimbursement for initial examinations lacked a section in patients' treatment reports dedicated to a review of systems, which is a necessary component of CPT Codes 99203, 99204, and 99205.

(c)  Misrepresentations Regarding the Extent of Medical Decision-Making

223.    In addition, when the Examination Defendants submitted charges for initial examinations under CPT Code 99205, they represented that Goloubenko, Focazio, Katz, Raitses, or another physician associated with the Examination Defendants engaged in medical decision-making of "high complexity."

224.    Similarly, when the Examination Defendants submitted charges for initial examinations under CPT Codes 99203 or 99204, they represented that Goloubenko, Focazio, Katz, Raitses, or another physician associated with the Examination Defendants engaged in medical decision-making of "moderate complexity."

225.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other

information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

226.    Though the Examination Defendants routinely falsely represented that their initial examinations involved medical decision-making of "high complexity" (when billed under CPT Code 99205) or "moderate complexity" (when billed under CPT Codes 99203 or 99204), in actuality the initial examinations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with such injuries or symptoms, the deficient initial examinations were incapable of assessing and/or diagnosing them as such.

227.    First, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Examination Defendants for "treatment" at the Clinics, pursuant to the Defendants' fraudulent scheme, they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Examination Defendants neither requested any medical records from any other providers nor conducted any diagnostic tests.

228.    Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from any automobile accidents at all.

229.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants, to the extent that the Defendants provided any such diagnostic procedures or treatment options in the first instance. In the unlikely event that such risks did exist, the deficient initial examinations were incapable of identifying such risks.

230.     In almost every instance, any diagnostic procedures and "treatments" that the Defendants actually provided were limited to a series of medically unnecessary pain management modalities and diagnostic tests, none of which were health- or life-threatening if properly administered.

231.     Third, the Examination Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations. Rather, to the extent that the initial examinations were conducted in the first instance, the Examination Defendants provided nearly identical, pre-determined "diagnoses" for the Insureds, and prescribed a similar course of treatment for each Insured.

232.     The Examination Defendants prepared phony initial examination reports in which they provided boilerplate sprain and strain diagnoses to virtually every Insured.

233.     For example, in the treatment reports submitted by County Medical, numerous patients were diagnosed with cervical issues despite the fact that there were no cervical complaints noted in the patients' records.

234.     Based upon these supposed "diagnoses," the Examination Defendants directed the Insureds to return to whichever Clinic the Examination Defendants treated them from, several times per week, for medically unnecessary follow-up examinations, diagnostic testing, physical therapy and occupational therapy sessions, and chiropractic services.

235.     Furthermore, CPT modifier 25 is used to indicate that a patient's condition required a significant, separately identifiable evaluation and management service above and beyond that associated with another procedure or service being reported by the same physician or other qualified healthcare provider on the same date. Accordingly, modifier 25 should be used sparingly.

236.     However, a review of the billing submitted by Neptune Medical revealed that modifier 25 was virtually always used to charge for initial and follow-up examinations. Yet, the supporting documentation failed to note which significant, separately identifiable evaluation and management service above and beyond that associated with an initial or follow-up examination was purportedly administered to Insureds. Thus, Neptune Medical engaged in upcoding as Katz or another healthcare provider associated with Neptune Medical performed procedures on the same date as evaluation services were provided.

237.     The putative results of the initial examinations did not genuinely reflect the Insureds' actual circumstances, but instead were designed solely to support the laundry list of Fraudulent Services that the Defendants purported to perform and then billed to Liberty Mutual and other insurers.

### ii.     The Fraudulent Follow-Up Examinations

238.     In addition to the fraudulent initial examinations, the Examination Defendants and the Goloubenko SP (collectively, the "Follow-Up Examination Defendants") typically purported to subject Insureds to one or more fraudulent follow-up examinations during the course of the fraudulent, pre-determined treatment protocol.

239.     The Follow-Up Examination Defendants then billed the follow-up examinations to Liberty Mutual under CPT Code 99213, typically resulting in a charge of $87.79, or CPT Code 99214, typically resulting in a charge of $92.98 or $127.40.

240.     Like the Examination Defendants' charges for initial examinations, the charges for the follow-up examinations were fraudulent in that the evaluations were: (i) medically unnecessary; and (ii) performed pursuant to the Defendants' fraudulent, pre-determined treatment and billing protocol and improper financial arrangements.

241.    The charges for the follow-up examinations were also fraudulent in that they misrepresented the extent of the follow-up examinations.

244.    The use of CPT Code 99213 typically requires that the physician spend 15 minutes of face-to-face time with the Insured or the Insured's family.

245.    Along similar lines, the use of CPT Code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family.

246.    Though the Follow-Up Examination Defendants routinely billed for the follow-up examinations under CPT Codes 99213 or 99214, the Follow-Up Examination Defendants did not spend 15 minutes of face-to-face time with the Insureds or their families during the follow-up examinations, much less 25 minutes. Rather, the follow-up examinations rarely lasted more than 10 minutes, to the extent that they were conducted at all.

247.    Furthermore, pursuant to the Fee Schedule, the use of CPT Code 99213 typically requires that the Insured present with problems of low to moderate severity.

248.    Along similar lines, pursuant to the Fee Schedule, the use of CPT Code 99214 typically requires that the Insured present with problems of moderate severity.

249.    Though the Follow-Up Examination Defendants routinely billed for the follow-up examinations under CPT Codes 99213 or 99214, the Insureds did not present with problems of low or moderate severity. Rather, the Insureds did not have medical problems at all as the result of any automobile accidents.

250.    In addition, when the Follow-Up Examination Defendants submitted charges for the follow-up examinations under CPT Code 99213, they falsely represented that they performed at least two of the following three components: (i) took an expanded problem-focused patient

history; (ii) conducted an expanded problem-focused physical examination; and (iii) engaged in medical decision-making of "low complexity."

251.    Along similar lines, when the Follow-Up Examination Defendants submitted charges for the follow-up examinations under CPT Code 99214, they falsely represented that they performed at least two of the following three components: (i) took a detailed patient history; (ii) conducted a detailed physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

252.    During the purported follow-up examinations, no physician or other healthcare provider associated with the Follow-Up Examination Defendants took an "expanded problem-focused" patient history or "expanded problem-focused" physical examination, much less a "detailed" patient history or "detailed" physical examination.

253.    What is more, during the purported follow-up examinations, no physician or other healthcare provider associated with the Follow-Up Examination Defendants engaged in medical decision-making of low or moderate complexity.

254.    Instead, in most cases, the Follow-Up Examination Defendants did not actually provide any legitimate follow-up examinations at all, but instead issued phony, boilerplate "follow-up examination" reports to support their fraudulent treatment and billing protocol.

255.    The bogus "follow-up examination" reports that the Follow-Up Examination Defendants compiled falsely suggested that the Insureds continued to suffer from injuries sustained in automobile accidents, and required additional Fraudulent Services in order to complete their recovery.

256.    These phony "follow-up examination" reports did not genuinely reflect the Insureds' actual circumstances, but instead were designed solely to continue to support the laundry

list of Fraudulent Services that the Provider Defendants purported to perform and then billed to Liberty Mutual and other insurers.

257.  Based on the fraudulent diagnoses contained within the "follow-up examination" reports, the Defendants directed Insureds to return to the Clinics several times per week for medically unnecessary services.

### iii.  The Fraudulent Outcome Assessment Tests

258.  In addition to the other Fraudulent Services, the Defendants, pursuant to the fraudulent, pre-determined treatment and billing protocol implemented and directed by the Management Defendants, caused bills to be submitted to Liberty Mutual representing that the Provider Defendants frequently subjected Insureds to multiple, medically useless "outcome assessment tests" on or about the same dates they purported to subject the Insureds to initial or follow-up examinations.

259.  The Defendants billed the "outcome assessment tests" allegedly performed by the Goloubenko SP, Goloubenko Medical, Goloubenko, County Medical, Focazio, Neptune Medical, Katz, Infinity Medical, and Raitses (along with the Management Defendants, collectively referred herein as the "OAT Defendants") to Liberty Mutual using CPT Codes 99354 and 99358, generally resulting in charges of $292.91 (when billed under CPT Code 99354) and $204.41 or $280.12 (when billed under CPT Code 99358) for each round of "testing."

260.  Like the Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the fraudulent, pre-determined treatment protocol established by the Management Defendants.

261.     What is more, to the extent that the "outcome assessment tests" were performed at all, they were performed improperly. Often, the tests were provided on or about the same dates Insureds were purportedly subjected to initial or follow-up examinations. In these instances, there was no outcome to assess, as there was no adequate time for improvement to occur.

262.     The "outcome assessment tests" that the OAT Defendants purportedly provided to Insureds – to the extent that they were provided at all – were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their daily lives.

263.     Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the "outcome assessment tests" that the OAT Defendants purportedly provided were nothing more than a questionnaire regarding an Insured's history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial and follow-up examinations.

264.     In other words, healthcare providers cannot conduct and bill for an initial or follow-up examination and then bill separately for contemporaneously-provided "outcome assessment testing." By submitting separate charges for initial and/or follow-up examinations on the same date of service as charges for "outcome assessment tests," Defendants unbundled charges for these tests or procedures in a calculated effort to maximize the amount of fraudulent No-Fault billing they could submit to Liberty Mutual and other automobile insurers.

265.     In the event the OAT Defendants did perform the "outcome assessment tests" for which Liberty Mutual was billed, the information gained through the use of these tests would not have been significantly different from the information that the OAT Defendants purported to

obtain during virtually every Insured's initial and follow-up examinations and from taking into consideration their patient histories. In fact, the OAT Defendants, in billing for fraudulent initial and follow-up examinations, represented that they took an "expanded problem-focused" or "detailed" patient history and performed an "expanded problem-focused" or "detailed" physical examination.

266.    Under the circumstances employed by the OAT Defendants, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories obtained and physical examinations purportedly conducted during the initial and follow-up examinations. The "outcome assessment tests" were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered – to the extent that it was rendered at all – pursuant to a fraudulent, pre-determined treatment protocol that was designed solely to financially enrich the Defendants and in no way aided in the assessment and treatment of the Insureds.

267.    The Defendants' use of CPT Codes 99354 and 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided.

268.    Pursuant to the Fee Schedule, the use of CPT Codes 99354 and 99358 represents – among other things – that a physician actually spent at least one hour performing some prolonged service, such as a review of extensive records and tests, or communication with the Insured or the Insured's family.

269.    Though the OAT Defendants routinely submitted billing under CPT Codes 99354 and 99358 for "outcome assessment tests" allegedly provided by the OAT Defendants, no physician associated with the OAT Defendants spent an hour reviewing or administering the tests, or communicating with the Insureds or their families.

270.     Indeed, the "outcome assessment tests" did not require any medical personnel involvement at all, inasmuch as the "tests" were simply questionnaires that were completed by the Insureds themselves.

271.     Nevertheless, the OAT Defendants submitted billing to Liberty Mutual under CPT Codes 99354 and 99358, falsely misrepresenting that Insureds were provided with "outcome assessment testing" by the OAT Defendants.

272.     In keeping with the fact that the outcome assessment tests were medically unnecessary and were performed pursuant to the Defendants' fraudulent, pre-determined treatment protocol, the results of the outcome assessment tests, like the results of the other Fraudulent Services, were not incorporated into the Insureds' respective treatment plans.

####          iv.     The Fraudulent Computerized Range of Motion/Muscle Strength Tests

273.     The Defendants routinely subjected the vast majority of Insureds to one or more sessions of medically unnecessary range of motion/muscle strength testing ("ROM/MT").

274.     Priority Care, Bakry, County Medical, and Focazio (collectively with the Management Defendants, the "ROM/MT Defendants") billed ROM/MT to Liberty Mutual under multiple units of CPT Codes 95831 and 95851, generally resulting in total charges ranging up to $675.00 for each session of ROM/MT "testing."

275.     The charges for the ROM/MT were fraudulent in that: (i) the ROM/MT was medically unnecessary; (ii) the ROM/MT Defendants unbundled the charges for the ROM/MT to artificially increase the amount that they could charge Liberty Mutual as these charges should have been reimbursed as part of Insureds' initial and/or follow-up examinations; and (iii) the ROM/MT was performed pursuant to the Management Defendants' fraudulent, pre-determined treatment protocol and the improper financial and referral arrangements between the Defendants and others.

(a) <u>Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength</u>

276.    The adult human body is made up of 206 bones joined together at various joints that are either of the fixed, hinged, or ball-and-socket variety. The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a knee, rotate a shoulder, or move the neck to one side.

277.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion." Stated in a more illustrative way, range of motion is the amount of movement at the joint.

278.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the limb actively or passively is moved around the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

279.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body or extremity in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles controlling movement at a patient's knee, he or she would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

280.    Physical evaluations performed on patients with soft-tissue trauma include range of motion and muscle strength tests, inasmuch as these tests provide a baseline for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, it may substantially limit the ability to properly diagnose or treat the patient's

injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" evaluation of a trauma patient.

281.    Since range of motion and muscle strength tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial and follow-up examinations.

282.    In other words, healthcare providers cannot conduct and bill for initial examinations and follow-up examinations, then bill separately for contemporaneously-provided range of motion and muscle strength tests.

(b) Defendants' ROM/MT was Duplicative and Medically Unnecessary

283.    At the Clinics where the Defendants allegedly rendered ROM/MT, the Insureds received manual range of motion and muscle strength tests during initial and follow-up examinations.

284.    The ROM/MT Defendants knew, prior to performing ROM/MT, that the Insureds had already received initial and/or follow-up examinations that included manual range of motion and muscle strength tests, as those initial and follow-up examinations served to justify the subsequent performance of the Fraudulent Services by the ROM/MT Defendants.

285.    Despite the fact that the ROM/MT Defendants knew that Insureds already had undergone manual range of motion and muscle strength testing during their initial and follow-up examinations from other healthcare providers, the Defendants systemically billed for, and purported to perform, ROM/MT on Insureds.

286.    The ROM/MT Defendants purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insured's body while

the Insured was asked to attempt various motions and movements. The test is virtually identical to the manual range of motion testing that is described above and that purportedly was performed during the initial and follow-up examinations, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

287.    Similarly, the ROM/MT Defendants purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured was asked to press multiple times using various muscle groups. As with the computerized range of motion tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial and follow-up examinations – except that a digital printout was obtained.

288.    The information gained through the use of the ROM/MT was not significantly different from the information obtained through the manual testing that was part and parcel of the Insured's initial and follow-up examinations. With the relatively minor soft-tissue injuries allegedly sustained by Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was insignificant.

289.    While ROM/MT can be a medically useful tool as part of a research project, under the circumstances employed by the ROM/MT Defendants it unnecessarily duplicated the manual range of motion and muscle strength testing purportedly conducted during virtually every Insured's initial and follow-up examinations.

290.    In short, the ROM/MT was rendered pursuant to a fraudulent, pre-determined treatment protocol that: (i) did not aid in the assessment and treatment of the Insureds; and (ii) financially enriched the Defendants.

> (c) The ROM/MT Defendants' Fraudulent Unbundling of Charges for the
> Computerized Range of Motion and Muscle Strength Tests

291. Not only did the ROM/MT Defendants deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle strength tests, they also unbundled their billing for the tests, which maximized the fraudulent charges that they could submit to Liberty Mutual.

292. Pursuant to the Fee Schedule, when computerized range of motion and muscle strength tests are performed on the same date, all of the testing should be reported and billed using CPT Code 97750.

293. CPT Code 97750, described as "physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes", identifies a number of multi-varied tests and measurements of physical performance of a select area or number of areas. These tests include services such as extremity testing for strength, dexterity, or stamina, and muscle strength testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation. They also include creation of a written report.

294. CPT Code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing. Thus, if a provider performed 15 minutes of computerized range of motion and muscle strength testing, it would be permitted a single charge of $45.71 under CPT Code 97750. If the provider performed 30 minutes of computerized range of motion and muscle strength testing, it would be permitted to submit two charges of $45.71 under CPT Code 97750, resulting in a total charge of $91.42, and so forth.

295. The ROM/MT Defendants virtually always purported to provide computerized range of motion and muscle strength tests to Insureds on the same dates of service.

296.    The computerized range of motion and muscle strength tests – together – usually did not take more than 15 minutes to perform. Thus, even if the computerized range of motion and muscle strength tests that the ROM/MT Defendants purported to perform were medically necessary, the Defendants would usually be limited to a single, time-based charge of $45.71 under CPT Code 97750 for each date of service on which they performed the computerized range of motion and muscle strength tests on an Insured.

297.    Nonetheless, to maximize their fraudulent billing for the computerized range of motion and muscle strength tests, the ROM/MT Defendants unbundled what should have been a single charge of $45.71 under CPT Code 97750 for both computerized range of motion and muscle strength testing into: (i) multiple charges of $43.60 under CPT Code 95831 (for the muscle strength tests); and (ii) multiple charges of $45.71 under CPT Code 95851 (for the range of motion tests).

298.    By unbundling what should have been a single $45.71 charge under CPT Code 97750 into multiple charges under CPT Codes 95831 and 95851, the ROM/MT Defendants increased by significant orders of magnitude the charges for the ROM/MT that they submitted, or caused to be submitted, to Liberty Mutual.

(d)    The ROM/MT Defendants' Fraudulent Misrepresentations as to the Existence of Written, Interpretive Reports Regarding the ROM/MT

299.    Not only were the ROM/MT Defendants' charges for the ROM/MT fraudulent because the tests were duplicative and medically unnecessary, and because the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that the ROM/MT Defendants prepared written reports interpreting the test data.

300.    Pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized muscle strength testing under CPT Code 95831 or for computerized range of motion

testing under CPT Code 95851, the provider represents that it prepared a written report interpreting the data obtained from the test.

301.    The CPT Assistant states that "[i]nterpretation of the results with preparation of a separate, distinctly identifiable, signed written report is required when reporting Codes 95851 and 95852."

302.    The CPT Assistant also states that "[t]he language included in the Code descriptor for use of these Codes indicates the preparation of a separate written report of the findings as a necessary component of the procedure" when using CPT Code 95831 to charge for muscle strength testing.

303.    Though the ROM/MT Defendants routinely submitted billing for the computerized range of motion and muscle strength tests using CPT Codes 95851 and 95831, the medical records submitted by the Defendants to Liberty Mutual usually did not include written reports interpreting the data obtained from the tests.

304.    Therefore, even if the ROM/MT Defendants had satisfied the other requirements to submit their billing for ROM/MT under CPT Codes 95851 and 95831 – and they did not – the Defendants' billing still did not comply with the Fee Schedule due to their consistent failure to submit a separate, distinctly identifiable, signed written report interpreting the results of the purported ROM/MT for any Insured.

305.    The ROM/MT Defendants frequently did not prepare written reports interpreting the data obtained from the tests because the tests were not meant to impact any Insured's course of treatment. Rather, the tests were performed as part of the ROM/MT Defendants' fraudulent, pre-determined treatment and billing protocol, which enriched the Defendants at the expense of Liberty Mutual, and as part of the Defendants' improper referral and financial arrangements.

306. To the extent that Defendants did prepare written reports interpreting the data obtained from the ROM/MT tests, the reports listed abnormal findings. For example, one report listed a patient's range of motion as 72 degrees out of a possible 60 degrees.

307. Along similar lines, with regard to the straight leg raise tests, the reports failed to list the angle at which the patient purportedly experienced pain (i.e., where the test produced a positive result).

308. Furthermore, certain reports even featured typos or misspellings (i.e., "sharp, shouting [sp], burning, …") when asking patients to describe their type and level of pain.

### v.    The Fraudulent Activity Limitation Measurement Tests

309. Furthermore, Priority Care and Bakry (collectively with the Management Defendants, the "ALM Defendants") subjected Insureds to medically unnecessary activity limitation measurement tests ("ALM Tests").

310. Like their charges for the other Fraudulent Services, the Defendants' charges for ALM Tests were fraudulent in that the tests were: (i) medically unnecessary; and (ii) performed pursuant to the Defendants' fraudulent, pre-determined treatment and billing protocol and improper financial arrangements.

311. The ALM Defendants purported to provide ALM Tests to Insureds despite knowing that the ALM Tests were medically unnecessary and duplicative of the manual range of motion and muscle strength tests that were performed during the initial and/or follow-up examinations, and/or the computerized ROM/MT that the Defendants also purported to perform.

312. Much like the duplicative computerized ROM/MT, the only substantive difference between the ALM Tests and the manual range of motion and muscle strength tests purportedly

provided by the Defendants during initial and follow-up examinations is that ALM Tests generate a digital printout of an Insured's muscle strength.

313.    The muscle strength data obtained through the use of ALM Tests was not significantly different from the information obtained through the manual testing that was part and parcel of the initial and follow-up examinations purportedly provided by the Defendants to Insureds.

314.    Nor was the muscle strength data obtained through the use of the ALM Tests significantly different from the data that the Defendants obtained through the computerized ROM/MT they purported to provide to Insureds.

315.    Under the circumstances employed, the ALM Tests represented purposeful and unnecessary duplication of the manual range of motion and muscle strength tests purportedly conducted during the initial and follow-up examinations, and of the medically unnecessary computerized ROM/MT.

316.    Not only did the ALM Defendants purport to provide duplicative and medically unnecessary ALM Tests, but they also billed in excess of the Fee Schedule for the ALM Tests, which again maximized the fraudulent charges that could be submitted to Liberty Mutual.

317.    The ALM Defendants billed Liberty Mutual for the ALM Tests using CPT Code 97799 at a charge of $475.00 per date of service. CPT Code 97799 is an "unlisted physical medicine/rehabilitation procedure" and is a by-report Code.

318.    However, pursuant to the Fee Schedule, ALM Tests should be billed under CPT Code 97750 at a charge of $45.71 per unit, for every 15 minutes of testing.

319.    CPT Code 97750, which is described as a "[p]hysical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes",

identifies a number of multi-varied tests and measurements of physical performance of a select area or number of areas. These tests must include services such as extremity testing for strength, dexterity, or stamina, and muscle strength testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation. They also must include the creation of a written report.

320.    Instead of billing under the proper Code, the ALM Defendants submitted inflated charges for the ALM Tests under CPT Code 97799 at a charge of $475.00 per date of service. Through this fraudulent billing protocol, the Defendants inflated the charges submitted to Liberty Mutual for each distinct session of ALM Tests.

321.    In keeping with the fact that the ALM Tests were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre-determined treatment and billing protocol, every single report submitted by the ALM Defendants contained an identical pre-printed "Activity Limitation Measurement and Training Report", which includes the following language:

> Purpose of activity limitation test is to accurately determine individual's ability to perform meaningful tasks safely and dependably. It is based on objective performance measurements that are analyzed and recorded by state of the art computer technology. It is not an observation or subjective determination of an individual's self-report of abilities.
>
> The patient was tested using JTech computerized evaluation system. Coefficient of Variation and difference between successive of 14% or less indicates validity, reproducibility and consistency of effort.
>
> In addition to testing patient received a comprehensive training as to how to deal with the limitation in both work and home environments. Patient received written and verbal instructions as how to avoid aggravating the injury and what steps need to be taken outside of formal medical setting in order to facilitate recovery.

322.    Furthermore, ALM Tests and ROM/MT tests are workers' compensation concepts, not personal injury concepts. Indeed, in purportedly justifying the medical necessity of these tests, Defendants referenced work practice guides as opposed to mainstream pain management guides,

which indicates that Defendants ordered and purportedly administered these tests inappropriately for billing purposes.

323.    In addition, these tests should be administered once a patient achieves maximum medical improvement. Instead, Defendants purportedly performed these tests in a serial manner, frequently subjecting Insureds to this type of testing during each purported visit.

324.    Like the other Fraudulent Services discussed herein, the ALM Tests were not meant to impact any Insured's course of treatment. Rather, the ALM Tests were performed as part of the Defendants' fraudulent, pre-determined treatment and billing protocol, which financially enriched the Defendants at the expense of Liberty Mutual, and as part of the improper financial and referral arrangements between the Defendants and others.

### vi.    The Fraudulent Charges for Physical Performance Tests

325.    In addition to the other Fraudulent Services, Defendants purportedly subjected Insureds to medically useless "physical performance tests" ("PPT Tests").

326.    Typically, Priority Care, Bakry, County Medical, and Focazio (collectively with the Management Defendants, the "PPT Defendants") billed PPT Tests to Liberty Mutual under CPT Code 97750, typically resulting in a charge of $274.26 per test.

327.    Like their charges for the other Fraudulent Services, the PPT Defendants' charges for PPT Tests were fraudulent in that the tests were: (i) medically unnecessary; and (ii) performed pursuant to the PPT Defendants' fraudulent, pre-determined treatment protocol and the improper financial arrangements between the PPT Defendants and others.

328.    The PPT Defendants purported to provide PPT Tests to Insureds despite their actual knowledge that the PPT Tests, to the extent that they were performed at all, were medically unnecessary and duplicative of the manual range of motion and muscle strength tests that were

performed during every examination and/or the computerized ROM/MT that frequently was purportedly performed on intervening dates.

329.    Much like the duplicative computerized ROM/MT, the only substantive difference between the PPT Tests and the manual range of motion and muscle strength tests purportedly provided by the Defendants during initial and follow-up examinations is that the PPT Tests generate a digital printout of an Insured's range of motion and/or muscle strength.

330.    The range of motion and muscle strength data obtained through the use of the PPT Tests are not significantly different from the information obtained through the manual testing that was part and parcel of the examinations purportedly provided by the Defendants to Insureds.

331.    Nor were the range of motion and muscle strength data obtained through the use of the PPT Tests significantly different from the data that the PPT Defendants obtained through the computerized ROM/MT they purported to provide to Insureds.

332.    In keeping with the fact that the PPT Tests were medically unnecessary and were performed pursuant to the Defendants' fraudulent, pre-determined treatment and billing protocol, the results of the PPT Tests, like the results of the other Fraudulent Services, were never incorporated into the Insureds' respective treatment plans.

### vii.    The Fraudulent Charges for Trigger Point Injections

333.    As part of the fraudulent, pre-determined treatment protocol and the Management Defendants' illegal financial arrangements, Insureds were subjected to medically useless and unnecessary trigger point injections.

334.    Neptune Medical and Katz (collectively with the Management Defendants, the "Pain Management Defendants") billed the trigger point injections to Liberty Mutual under CPT

Code 20553, typically resulting in a charge of $131.00 for each round of trigger point injections they purported to perform and/or provide.

335.    Like the Defendants' charges for the other Fraudulent Services, the charges for the trigger point injections were fraudulent in that the pain management treatment was performed – to the extent that it was performed at all – pursuant to the: (i) Management Defendants' directive; (ii) fraudulent, pre-determined treatment protocol; and (iii) improper financial and referral arrangements.

(a) Legitimate Use of Trigger Point Injections

336.    Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

337.    Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

338.    Any legitimate pain management treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

339.    In a legitimate clinical setting, trigger point injections should not be administered until a patient has failed or been intolerant of conservative therapies.

340.    This is because the substantial majority of soft-tissue injuries such as sprains and strains will resolve over a period of days or weeks through conservative treatment, and invasive

pain management injections entail a degree of risk to the patient that is absent in more conservative forms of treatment.

(b) Defendants' Medically Unnecessary Trigger Point Injections

341.    However, the Pain Management Defendants – at the direction of the Management Defendants – routinely purported to subject Insureds to trigger point injections soon after the Insureds' underlying automobile accidents, long before the Insureds could have tried and failed any course of legitimate, conservative treatment.

342.    For example:

(i)    On March 17, 2023, an Insured named KK was involved in an automobile accident. Though KK could not have experienced persistent pain symptoms or failed conservative treatments, Neptune Medical – at the direction of the Management Defendants – purported to administer trigger point injections to KK on March 20, 2023, only three days after her accident.

(ii)    On March 17, 2023, an Insured named VK was involved in an automobile accident. Though VK could not have experienced persistent pain symptoms or failed conservative treatments, Neptune Medical – at the direction of the Management Defendants – purported to administer trigger point injections to VK on March 20, 2023, only three days after his accident.

(iii)    On October 7, 2022, an Insured named LGG was involved in an automobile accident. Though LGG could not have experienced persistent pain symptoms or failed conservative treatments, Neptune Medical – at the direction of the Management Defendants – purported to administer trigger point injections to LGG on October 12, 2022, only five days after her accident.

(iv)    On March 14, 2023, an Insured named VL was involved in an automobile accident. Though VL could not have experienced persistent pain symptoms or failed conservative treatments, Neptune Medical – at the direction of the Management Defendants – purported to administer trigger point injections on March 20, 2023, only six days after his accident.

(v)    On September 12, 2023, an Insured named JC was involved in an automobile accident. Though JC could not have experienced persistent pain symptoms or failed conservative treatments, Neptune Medical – at the direction of the Management Defendants – purported to administer trigger point injections on September 18, 2023, only six days after her accident.

343.    These are just representative examples.

344.    Pain Management Defendants engaged in this conduct solely to maximize the fraudulent billing they could submit, or cause to be submitted, to Liberty Mutual, rather than to treat or otherwise benefit the Insureds who were subjected to the injections.

345.    The Defendants should have exhausted traditional, conservative therapies prior to administering trigger point injections, as these injections can lead to serious medical consequences. Indeed, by offering interventional treatments such as the administration of trigger point injections at the beginning of a patient's course of treatment, before conservative therapies were even attempted or proved ineffective, Defendants deviated from well-established and acceptable standards of care.

346.    In addition, the frequency of treatments should decrease if a patient experiences improvement. For example, trigger point injections, if correctly administered, would resolve pain, and there would be a decreased need for continued treatment with this method. However, the Pain Management Defendants purported to subject Insureds to serial trigger point injection sessions.

347.    To further increase the fraudulent billing they could submit for a medically unnecessary trigger point injection session, the Pain Management Defendants routinely included a separate charge of $289.20, under CPT Code 76942, for "ultrasound guidance" of the trigger point injections.

348.    The charges for "ultrasound guidance" of the injections were fraudulent inasmuch as the ultrasound guidance, like the underlying trigger point injection itself, was not medically necessary and was performed – to the extent that it was performed at all – pursuant to a fraudulent, pre-determined protocol designed to maximize the Defendants' billing rather than to treat or otherwise benefit the Insureds purportedly subjected to it.

349.    In keeping with the fact that ultrasound guidance is not required to properly administer a trigger point injection, a trigger point is a painful area that a patient or provider can manually feel. Therefore, ultrasound guidance is not required to locate an area that can be identified through touch.

350.    The Pain Management Defendants purported to perform and/or provide these medically unnecessary trigger point injections because their focus was on generating profits, rather than on patient care, and because the Provider Defendants were operated pursuant to the pecuniary interests of the Management Defendants, rather than the legitimate medical judgment of true medical practitioner-owners.

### viii.    The Fraudulent Chiropractic Treatments

351.    In addition to the other Fraudulent Services that Defendants purported to provide, the Gorelik SP, Amon Chiro, Cronos Chiro, and Gorelik (collectively with the Management Defendants, the "Chiropractic Defendants") routinely purported to subject Insureds to chiropractic services at the Clinics.

352.    As with the charges for the other Fraudulent Services, the charges for chiropractic treatments were fraudulent in that they were: (i) medically unnecessary; (ii) performed pursuant to the exaggerated diagnoses set forth in the fraudulent initial chiropractic examinations and as part and parcel of the Defendants' fraudulent treatment and billing protocol; and (iii) provided pursuant to the improper referral and financial arrangements amongst the Defendants and others.

#### (a)    The Fraudulent Chiropractic Initial and Follow-Up Examinations

353.    In addition to the fraudulent medical examinations conducted by the Examination Defendants, Insureds at the Clinics were also subjected to an initial chiropractic examination which served as "justification" to provide medically unnecessary, illusory, or otherwise non-reimbursable

chiropractic treatments. The Chiropractic Defendants routinely billed the initial chiropractic examinations to Liberty Mutual under CPT Code 99203, resulting in a charge of $75.00.

354.    In addition to the initial chiropractic examinations, the Chiropractic Defendants purported to subject Insureds to one or more follow-up chiropractic examinations, which they billed to Liberty Mutual under CPT Code 99212, typically resulting in a charge of $26.41 or $36.19.

355.    The charges for the chiropractic examinations were fraudulent in that they: (i) misrepresented the extent of the Insureds' presenting problems; (ii) misrepresented the amount of time spent on the examinations; (iii) misrepresented the extent of the examinations allegedly performed; and (iv) misrepresented the extent of medical decision-making.

356.    Pursuant to the American Medical Association's CPT Assistant, the use of CPT Code 99203 to bill for an initial chiropractic patient examination typically requires that the Insured present with problems of moderate severity.

357.    By contrast, to the extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems were virtually always low severity soft-tissue injuries such as sprains and strains. However, the Chiropractic Defendants routinely billed for the putative initial chiropractic examinations using CPT Code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

358.    The Chiropractic Defendants routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT Code 99203 because examinations billable under CPT Code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity.

359.    The Chiropractic Defendants also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including chiropractic services.

360.    Pursuant to the Fee Schedule, the use of CPT Code 99203 also represents that the chiropractor who performed the initial examination spent at least 30 minutes of face-to-face time with the Insured or the Insured's family.

361.    When the Chiropractic Defendants submitted billing for initial chiropractic examinations under CPT Code 99203, they represented that the chiropractors who performed the initial examinations spent at least 30 minutes of face-to-face time with the Insureds or their families during the putative examinations.

362.    In fact, none of the chiropractors associated with the Chiropractic Defendants actually spent 30 minutes performing the initial chiropractic examinations. To the extent that these examinations were performed in the first instance, they did not entail 30 minutes of face-to-face time between the examining chiropractors and the Insureds or their families.

363.    Rather, to perform the perfunctory initial chiropractic examinations, the Chiropractic Defendants used a simple boilerplate, template, checklist form designed for speed and convenience. This template form set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations – many of which were incomplete, inaccurate, or not performed in the first instance.

364.    The only face-to-face time between the examining chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

365.     These brief interviews and limited examinations did not require any chiropractor to spend 30 minutes of face-to-face time with the Insureds or their families. Rather, the initial examinations rarely lasted more than 10 minutes, to the extent that they were conducted at all.

366.     The Chiropractic Defendants falsely represented that the initial chiropractic examinations involved 30 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT Code 99203 because examinations billable under CPT Code 99203 are reimbursable at a higher rate than examinations that require less time to perform.

367.     When the Chiropractic Defendants billed for the initial chiropractic examinations under CPT Code 99203, they also falsely represented that the examining chiropractors performed "detailed" examinations of the Insureds.

368.     What is more, the Chiropractic Defendants provided a nearly identical, pre-determined laundry list of exaggerated "diagnoses" for every Insured, and prescribed a virtually identical course of treatment for every Insured. To the extent that the Insureds ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems were virtually always limited to ordinary sprains or strains of the neck and/or back.

369.     These unsubstantiated and exaggerated diagnoses and treatment plans bore no actual relationship to the conditions the Insureds actually presented, but were simply recited as a matter of course in order to justify the performance of the chiropractic services and other Fraudulent Services.

370.     The claims for initial and follow-up chiropractic examinations were fraudulent in that the Chiropractic Defendants routinely falsely represented the extent of the examinations as

well as the diagnoses and conditions of the Insureds for the sole purpose of justifying additional billing submitted by the Defendants for the Fraudulent Services.

371.    Indeed, subsequent to the initial and follow-up chiropractic examinations, Insureds were prescribed and given medically unnecessary extended courses of chiropractic services. In fact, the Chiropractic Defendants purported to provide Insureds with weeks or months of chiropractic services, including chiropractic manipulation therapy and myofascial release or trigger point therapy services.

### (b) The Fraudulent Chiropractic Treatments

372.    Following the fraudulent chiropractic examinations, the Chiropractic Defendants, at the direction of the Management Defendants, purported to provide Insureds with months of chiropractic manipulation therapy that was billed primarily under CPT Codes 98940 and 98941.

373.    Like the other charges for the Fraudulent Services, the charges for the chiropractic manipulation treatments were fraudulent in that the services were medically unnecessary and were performed pursuant to the Defendants' fraudulent, pre-determined treatment and billing protocol.

374.    Insureds were subjected to multiple sessions of chiropractic manipulation therapy per week over a period of many months, generally resulting in thousands of dollars of charges for each Insured. The purported results of the other Fraudulent Services were used by the Defendants as justification for continued rounds of chiropractic manipulation therapy despite the fact that the Chiropractic Defendants never incorporated the so-called "findings" of the other Defendants or the results of the other Fraudulent Services into the chiropractic manipulation therapy. For example:

> (i)    no details were provided to distinguish which vertebral levels were treated or the length or duration of the adjunctive therapies that were applied;

(ii)     there was no detailed assessment to substantiate the patients' injuries or to locate the specific area of injury; and

(iii)    there was little to no change in the diagnoses during the entire course of treatment, which was not tailored to the needs of the individual patients in the first instance.

375.    Nor was there ever any assessment or modification of the chiropractic manipulation therapy as a result of the other Defendants' findings or the other Fraudulent Services. In fact, the Chiropractic Defendants never modified an Insured's chiropractic care regardless of the individual symptoms or actual response to the treatment.

376.    In keeping with the fact that the Chiropractic Defendants submitted bills to Liberty Mutual as part of a fraudulent scheme to generate profits, in addition to purportedly providing Insureds with chiropractic manipulation therapy multiple times per week for months, Amon Chiro and Cronos Chiro also purported to render additional services to Insureds, such as myofascial release or trigger point therapy services, which the Chiropractic Defendants billed to Liberty Mutual under CPT Code 97139, typically resulting in a charge of $27.60.

377.    In keeping with the fact that the chiropractic services were fraudulent, the accompanying reports submitted with the billing did not list the specific area of injury and subsequent treatment.

378.    Furthermore, Insureds experienced proportional improvement and/or a linear response to purported treatments (e.g., an Insured's initial pain level would be noted as a 6 out of 10, would increase to a 7 or 8 over the course of several chiropractic treatment sessions, decrease to a 6 again, and then repeat during the course of an Insured's treatment). What is more, virtually all of Defendant Gorelik's patients had a "fair" prognosis and experienced little to no improvement.

379.     In addition, with regard to the myofascial release or trigger point therapy services, the accompanying reports do not specify the distinct region to which they were administered.

380.     The weeks or months of continued, unchanging chiropractic treatments performed on virtually every Insured were not based on medical necessity and were not intended to resolve the complaints or symptoms of the Insureds. Instead, the "protocol" approach to the performance of chiropractic treatments was designed solely to maximize the charges that the Defendants could submit to Liberty Mutual, and other automobile insurers, and to maximize the revenues that could be generated from each Insured who was subjected to the protocol.

### ix.     The Fraudulent Physical Therapy Treatments

381.     Consistent with the excessive and fraudulent provision of healthcare services that the Defendants purported to provide to Insureds at the Clinics, Priority Care, Bakry, County Medical, Focazio, Belyanskaya OT, Belyanskaya, Best Touch, and Mahmoud (collectively with the Management Defendants, the "PT Defendants"), at the direction of the Management Defendants, purported to subject virtually every Insured to a pre-determined physical therapy regime.

382.     Like the Defendants' charges for the other Fraudulent Services, the charges for physical therapy treatments were fraudulent in that they were: (i) medically unnecessary; (ii) performed pursuant to the exaggerated diagnoses set forth in the initial and follow-up examinations and as part and parcel of the Defendants' fraudulent treatment and billing protocol; and (iii) provided pursuant to the improper referral and financial arrangements amongst the Defendants and others.

383.    The charges for physical therapy treatments allegedly provided through the PT Defendants also misrepresented the PT Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance.

384.    In most cases, the PT Defendants purported to subject each Insured to dozens of physical therapy treatments over an extended period of time, generally resulting in thousands of dollars of charges for each Insured.

385.    In most cases, the Insureds did not go to the hospital at all following their putative accidents and, to the extent that they did visit a hospital or other legitimate healthcare provider after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after an hour or two.

386.    Nonetheless, pursuant to the Defendants' fraudulent treatment and billing protocol, following their initial and follow-up examinations, virtually every Insured was prescribed a medically unnecessary, extended course of physical therapy.

387.    The PT Defendants' charges for the physical therapy were predicated on the boilerplate "diagnoses" they provided to the Insureds following the initial and follow-up examinations, as well as the medically useless diagnostic tests.

388.    In keeping with the fact that the diagnostic tests administered by the PT Defendants were medically useless, the diagnostic tests produced questionable findings that served to justify further treatment. For example, back pain does not produce a positive Kemp's Test. Rather, a positive test requires the presence of sciatic pain, which can occur in the cervical region if the impact from an automobile accident was severe.

389.    Indeed, orthopedic tests are designed to stress the area of pain or injury. Thus, any movement will cause soreness, for example, but this soreness does not translate to a positive test.

Similarly, if there is a pinched nerve, a cervical distraction test, which utilizes movement to relieve pressure in a particular area, will cause decompression and produce pain relief. Exactly which parameters the PT Defendants utilized to determine positive test results remained unclear.

390.   But for these contrived "diagnoses" and positive diagnostic tests, the PT Defendants would not have been able to submit charges for the physical therapy because they would have no way to justify the performance of the physical therapy.

**x.   The Fraudulent Neurological Consultations and Electrodiagnostic Testing**

391.   Based upon the fraudulent, pre-determined "diagnoses" that Defendants purported to provide to Insureds during their ersatz initial "examinations," Amon Chiro, Gorelik, County Medical, Focazio, Neptune Medical, Katz, Infinity Medical, and Raitses (collectively with the Management Defendants, the "EMG/NCV Defendants") purported to subject Insureds to a series of medically unnecessary electrodiagnostic tests, including nerve conduction ("NCV") tests and electromyography ("EMG") tests (collectively, the "electrodiagnostic" or "EDX" tests) in an attempt to maximize the fraudulent billing submitted to Liberty Mutual.

392.   The EMG/NCV Defendants virtually always billed Liberty Mutual using CPT Codes 95904, 95905, 95911, 95912, 95913, 95861, 95864, 95886, and 95934, frequently resulting in charges of more than $1,000.00 for each Insured on whom the electrodiagnostic testing was purportedly performed.

393.   Like the charges for the other Fraudulent Services, the charges for the neurological consultations and EDX tests were fraudulent in that they were: (i) medically unnecessary; (ii) performed pursuant to the exaggerated diagnoses set forth in the initial and follow-up examination reports and as part and parcel of the Defendants' fraudulent treatment and billing protocol, designed solely to financially enrich Defendants rather than to treat or otherwise benefit the

Insureds purportedly subjected to the testing; and (iii) provided pursuant to the improper referral and financial arrangements amongst Defendants and others.

(a) <u>Misrepresentations Regarding the Fraudulent Neurological Consultations</u>

394.    Amon Chiro, Gorelik, County Medical, Focazio, Neptune Medical, and Katz routinely purported to provide Insureds with one or more neurological consultations.

395.    The neurological consultations were then typically billed under CPT Codes 99243 or 99244, virtually always resulting in charges of $130.60, $236.95, or $248.33 (when billed under CPT Code 99243), or a charge of $236.94 (when billed under CPT Code 99244) for every purported neurological consultation.

396.    The charges for the neurological consultations were fraudulent in that they were: (i) medically unnecessary; and (ii) performed – to the extent that they were performed at all – pursuant to the Defendants' fraudulent treatment and billing protocol and illegal financial arrangements, not to treat or otherwise benefit Insureds.

397.    The initial neurological consultations were also performed as a "gateway" in order to provide Insureds with a number of phony, pre-determined "diagnoses" so that the EMG/NCV Defendants could then purport to provide medically unnecessary, illusory, or otherwise non-reimbursable EMG and NCV tests.

398.    In addition to being medically unnecessary, the Defendants' charges for the neurological consultations were fraudulent because they misrepresented the nature and extent of the underlying service.

399.    Pursuant to the Fee Schedule, the use of CPT Code 99243 or 99244 represents that the examining physician performed a "consultation" at the request of another physician or other appropriate source.

400.    However, Defendants did not provide their purported neurological consultations –
to the extent that they were provided at all – at the request of any other physicians or appropriate
sources. Rather, to the extent that the putative consultations were performed in the first instance,
they were performed as part and parcel of the Defendants' fraudulent treatment and billing protocol
and pursuant to illegal financial arrangements, not to treat or otherwise benefit Insureds.

401.    Although the boilerplate neurological consultation notes state that Insureds were
referred, the purpose of the purported neurological consultations was merely to provide a false
basis to justify the EMG/NCV tests that Defendants then purported to provide at the conclusion of
the consultations, as well as to provide a false basis for Defendants to perform additional
Fraudulent Services, including physical therapy, occupational therapy, and chiropractic
treatments.

402.    In keeping with the fact that Defendants did not provide their purported
consultations at the request of another physician or appropriate source, the supposed "results" of
the putative consultations were not transmitted back to any referring physicians or other
appropriate sources. In addition, the supposed results of the putative consultations were neither
incorporated into any of the Insureds' treatment plans nor otherwise acted upon in any way.

403.    Furthermore, in the claims for consultations under CPT Codes 99243 and 99244,
Defendants misrepresented the severity of the Insureds' presenting problems. The use of CPT
Code 99243 typically requires that the Insured presented with problems of moderate severity, and
with problems of moderate to high severity under CPT Code 99244.

404.    Though the EMG/NCV Defendants typically billed for the neurological
consultations under CPT Codes 99243 or 99244, the Insureds virtually never presented with
problems of moderate to high severity and, in the unlikely event that an Insured was to present

85

with problems of moderate to high severity, the deficient initial examinations or consultations performed were incapable of assessing and/or diagnosing problems of such severity.

405.    By contrast, to the extent that Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity, soft-tissue injuries such as sprains and strains.

406.    For instance, and in keeping with the fact that Insureds either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, the vast majority of Insureds did not seek treatment at any hospital as the result of their accidents.

407.    To the extent that Insureds did seek treatment at a hospital as the result of their accidents, they virtually always were briefly observed on an outpatient basis and released after a few hours.

408.    To the limited extent that Insureds experienced any injuries at all as the result of their automobile accidents, the injuries were garden-variety, soft-tissue injuries, the vast majority of which resolve after a short course of conservative treatment, or no treatment at all.

409.    Furthermore, the EMG/NCV Defendants misrepresented and exaggerated the amount of face-to-face time that examining physicians spent with Insureds or their families.

410.    The use of CPT Code 99244 typically requires that a physician spend 60 minutes of face-to-face time with the Insured or the Insured's family. Along similar lines, the use of CPT Code 99243 typically requires that a physician spend 40 minutes of face-to-face time with the Insured or the Insured's family.

411.    Although the EMG/NCV Defendants billed for their putative neurological consultations under CPT Codes 99244 and 99243, no physician associated with Amon Chiro, County Medical, or Neptune Medical ever spent 40 minutes on a neurological consultation, let

86

alone 60 minutes. To the extent that the neurological consultations were actually conducted, they lasted a fraction of the time represented by the billing.

412.    In keeping with the fact that the consultations rarely lasted more than 10-15 minutes, much less 40 or 60 minutes, Defendants used boilerplate forms to document the initial consultations, which set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

413.    All that was required to complete the boilerplate forms was a brief patient interview and a perfunctory physical examination of the Insured, consisting of basic range of motion and muscle strength testing, and incomplete neurological testing.

414.    In their claims for the initial consultations, Defendants falsely represented that the putative consultations involved at least 40 minutes of face-to-face time with the Insureds or their families because consultations that entail at least 40 minutes of face-to-face time are reimbursable at higher rates than consultations that require less time to perform.

415.    In addition, pursuant to the Fee Schedule, when the EMG/NCV Defendants submitted charges for neurological consultations under CPT Code 99244, or caused them to be submitted, they falsely represented that a physician associated with Amon Chiro, County Medical, or Neptune Medical: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

416.    Pursuant to the Fee Schedule, a "comprehensive" patient history requires, among other things, that the healthcare provider take a review of all body systems, not only the body systems that are related to the patient's present complaint. A "comprehensive" patient history also requires that the healthcare provider take a complete past, family, and social history from the patient.

417.     When the EMG/NCV Defendants submitted billing for the neurological consultations under CPT Code 99244, they falsely represented that they took a "comprehensive" patient history from each Insured they purported to treat during the consultations.

418.     Instead, after purportedly providing the neurological consultations, the EMG/NCV Defendants simply prepared reports containing phony or boilerplate patient histories designed solely to support the EDX tests they purported to provide – as well as other Fraudulent Services by routinely recommending that Insureds commence or continue to undergo physical therapy and/or chiropractic treatments – and then bill to Liberty Mutual and other insurers.

419.     Along similar lines, pursuant to the Fee Schedule, when the EMG/NCV Defendants submitted charges for neurological consultations under CPT Code 99243, or caused them to be submitted, they falsely represented that a physician associated with Amon Chiro or County Medical: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "low complexity."

420.     Pursuant to the Fee Schedule, a patient history does not qualify as "detailed" unless the physician has conducted a "detailed" or "extended" review of the patient's systems. A physician has not conducted an "extended" review of a patient's systems unless the physician has documented a review of a limited number of additional systems directly related to the history of the patient's present illness, as well as related organ systems.

421.     When Defendants billed for initial consultations under CPT Code 99243, they falsely represented that a physician took a "detailed" patient history from the Insured. In fact, no healthcare provider associated with Defendants took a "detailed" patient history from the Insureds they purported to evaluate during the consultations because they did not document a review of organ systems pertinent to the history of the patients' present illnesses.

422.     Rather, after purporting to provide the consultations, Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents. Even in the unlikely event that an Insured continued to suffer from any injuries, there was no adequate neurological history and examination performed to create a foundation for the diagnostic testing.

423.     These phony patient histories did not genuinely reflect the Insureds' actual circumstances, but instead were designed solely to support the Fraudulent Services that Defendants purported to provide and then bill to Liberty Mutual and other insurers.

424.     Moreover, pursuant to the CPT Assistant, a physical examination does not qualify as "detailed" unless the healthcare provider conducts an extended examination of the affected body area or organ system and other symptomatic or related organ systems.

425.     In keeping with the fact that the patient histories and physical examinations were consistently misrepresented by Defendants and performed pursuant to a fraudulent, pre-determined protocol and illegal financial arrangements, the determinations on the consultation reports were fraudulent in that they consisted of pre-printed, generic language, despite Insureds' individual symptoms and presentments.

426.     Due to the fact that prognosis and causality determinations are to be made based upon an individualized review of the patient's complaints, presentment, medical history, and physical examination, it would be medically impossible for almost every Insured seen by Defendants to have substantially similar prognosis and causality determinations. These pre-printed findings were inaccurate and fraudulent and were simply a way for Defendants to order additional medically unnecessary neurodiagnostic treatments.

427.    Furthermore, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

428.    Although the EMG/NCV Defendants routinely falsely represented that their neurological consultations involved medical decision-making of "low" to "moderate" complexity when billing under CPT Codes 99243 or 99244, in actuality, the consultations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with such injuries or symptoms, the deficient initial consultations were incapable of assessing and/or diagnosing them as such.

429.    The putative neurological consultations did not involve any actual medical decision-making at all because the outcomes were pre-determined to result in substantially similar, phony "diagnoses" and medically unnecessary treatment plans for virtually every Insured.

430.    Indeed, to the extent the neurological consultations were conducted in the first instance, the EMG/NCV Defendants merely issued boilerplate, pre-determined "diagnoses" to Insureds, performed the EDX tests on Insureds immediately following the phony neurological consultations, and recommended that Insureds commence or continue receiving physical therapy and chiropractic treatments from the other Provider Defendants.

90

(b) The Human Nervous System and Electrodiagnostic Testing

431.   The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

432.   Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

433.   The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

434.   The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

435.   The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, loss of muscle control, and alteration of reflexes.

436.   EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

437.   The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely

91

to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

438.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

(c)   The Fraudulent Charges for NCV Tests

439.    NCV tests are non-invasive tests in which peripheral nerves, including those in the arms and legs, are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin.

440.    An EMG/NCV machine documents the timing of the nerve response (the "latency") and the magnitude of the response (the "amplitude"), and then calculates the speed at which the nerve conducts the impulse over a measured distance from one site to another (the "conduction velocity").

441.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

442.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be examined with NCV tests.

443.     F-wave and H-reflex studies are other types of NCV tests that may be performed in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back down again. The motor and sensory NCV tests are designed to evaluate nerve conduction in nerves within a limb.

444.     According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

445.     Even so, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the EMG/NCV Defendants routinely purported to perform testing on far more nerves than suggested by the Recommended Policy.

446.     Specifically, to maximize the fraudulent charges they could submit to Liberty Mutual and other insurers, the EMG/NCV Defendants routinely purported to perform and/or provide: (i) NCV tests of four to ten motor nerves; (ii) NCV tests of four to twelve sensory nerves; (iii) up to ten F-wave studies; and/or (iv) at least two H-reflex studies, all supposedly to determine whether Insureds suffered from radiculopathies.

447.     The EMG/NCV Defendants routinely purported to perform and/or provide NCVs on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges they could submit to Liberty Mutual and other insurers, not because the NCV tests were medically necessary to determine whether Insureds had radiculopathies or any other medical conditions.

448.     What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

449.     In a legitimate clinical setting, this decision is made based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

450.     As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient to patient.

451.     This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

452.     This concept is also emphasized in the CPT Assistant, which states that "pre-set protocols automatically testing a large number of nerves are not appropriate."

453.     Even so, the EMG/NCV Defendants did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

454.     Instead, the EMG/NCV Defendants applied a fraudulent "protocol" and purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers in many of the NCV test claims identified in Exhibits "4," "5," "8" and "9":

> (i)      left and right peroneal motor nerves;
>
> (ii)     left and right tibial motor nerves;
>
> (iii)    left and right median motor nerves;
>
> (iv)     left and right ulnar motor nerves;
>
> (v)      left and right radial motor nerves;

(vi)     left and right saphenous sensory nerves;

(vii)    left and right radial sensory nerves;

(viii)   left and right superficial peroneal sensory nerves;

(ix)     left and right sural sensory nerves;

(x)      left and right median sensory nerves; and

(xi)     left and right ulnar sensory nerves.

455.    Though the NCVs were allegedly rendered to Insureds in order to determine whether the Insureds suffered from radiculopathies, there was no adequate neurological history and examination performed to create a foundation for the EDX testing. In actuality, the NCV tests were provided to Insureds – to the extent they were provided at all – as part of a fraudulent, pre-determined protocol designed to maximize the billing that could be submitted for each Insured, rather than to treat or otherwise benefit the Insureds subjected to the testing.

456.    Furthermore, it was inappropriate for the Defendants to submit billing for NCV tests using CPT Code 95905 as this Code is not used in traditional NCV studies. Specifically, this Code is used to bill for NCV studies conducted using a handheld automated nerve conduction device, such as the NC-stat system, which is primarily utilized for at-home or hospice care, rather than outpatient settings.

457.    In keeping with the fact that the Defendants' NCV tests were administered as part of a fraudulent, pre-determined protocol designed to maximize billing rather than to treat or benefit the Insureds, the putative results of the NCV tests were often medically impossible.

458.    For example:

(i)      On November 29, 2022, Amon Chiro purportedly provided NCV tests to an Insured named VP. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the: (i) left median motor nerve as "9.8" at the wrist and

"10.3" at the elbow; (ii) right median motor nerve as "15.6" at the wrist and "15.9" at the elbow; (iii) left peroneal motor nerve as "2.9" at the ankle and "3.9" below the fibular head; (iv) right peroneal motor nerve as "2.8" at the ankle and "3.7" below the fibular head; (v) left tibial motor nerve as "4.8" at the ankle and "6.0" at the knee; and (vi) right ulnar motor nerve as "6.2" at the wrist and "6.4" at the elbow. However, it is medically impossible for the amplitude of the action potential to increase between the wrist and the elbow, the ankle and below the fibular head, and the ankle and the knee. Moreover, the H-reflex studies for the left tibial motor nerve and the right tibial motor nerve both measured a latency of "32.00". However, it is medically impossible for the latency of two different nerves to be exactly the same.

(ii)     On January 24, 2023, Amon Chiro purportedly provided NCV tests to an Insured named GV. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the: (i) left median motor nerve as "5.0" at the wrist and "7.3" at the elbow; and (ii) right ulnar motor nerve as "4.0" at the wrist and "4.9" at the elbow. However, it is medically impossible for the amplitude of the action potential to increase between the wrist and the elbow. Moreover, the F-wave studies for the left ulnar motor nerve and right ulnar motor nerve both measured a latency of "25.47". However, it is medically impossible for the latency of two different nerves to be exactly the same.

(iii)    On March 21, 2023, Amon Chiro purportedly provided NCV tests to an Insured named BM. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the left tibial motor nerve as "4.9" at the ankle and "6.4" at the knee. However, it is medically impossible for the amplitude of the action potential to increase between the ankle and the knee. Moreover, the H-reflex studies for the left tibial motor nerve and the right tibial motor nerve both measured a latency of "30.06". However, it is medically impossible for the latency of two different nerves to be exactly the same.

(iv)     On October 30, 2019, County Medical purportedly provided NCV tests to an Insured named AJ. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the left ulnar motor nerve as "6.08" at the wrist and "6.35" at the elbow. However, it is medically impossible for the amplitude of the action potential to increase between the wrist and the elbow.

(v)      On December 4, 2019, County Medical purportedly provided NCV tests to an Insured named YT. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the left ulnar motor nerve as "11.44" at the wrist and

"12.42" at the elbow. However, it is medically impossible for the amplitude of the action potential to increase between the wrist and the elbow.

(vi)     On July 29, 2020, County Medical purportedly provided NCV tests to an Insured named DS. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the: (i) left tibial motor nerve as "4.41" at the ankle and "4.63" at the knee; and (ii) right tibial motor nerve as "3.99" at the ankle and "4.83" at the knee. However, it is medically impossible for the amplitude of the action potential to increase between the ankle and the knee.

(vii)    On September 28, 2022, Neptune Medical purportedly provided NCV tests to an Insured named OS. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the: (i) right median motor nerve as "12.35" at the wrist and "14.11" at the elbow; (ii) left median motor nerve as "8.96" at the wrist and "9.98" at the elbow; and (iii) left ulnar motor nerve as "3.79" at the wrist and "7.32" at the elbow. However, it is medically impossible for the amplitude of the action potential to increase between the wrist and the elbow.

(viii)   On October 27, 2022, Neptune Medical purportedly provided NCV tests to an Insured named TA. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the right median motor nerve as "6.02" at the wrist and "7.07" at the elbow. However, it is medically impossible for the amplitude of the action potential to increase between the wrist and the elbow.

(ix)     On January 31, 2023, Neptune Medical purportedly provided NCV tests to an Insured named NA. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the: (i) right median motor nerve as "5.19" at the wrist and "5.38" at the elbow; (ii) right ulnar motor nerve as "9.21" at the wrist and "9.63" at the elbow; and (iii) left median motor nerve as "5.40" at the wrist and "8.41" at the elbow. However, it is medically impossible for the amplitude of the action potential to increase between the wrist and the elbow.

(x)      On October 25, 2021, Infinity Medical purportedly provided NCV tests to an Insured named AF. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the right median motor nerve as "6.00" at the wrist and "7.53" at the elbow. However, it is medically impossible for the amplitude of the action potential to increase between the wrist and the elbow.

(xi)  On December 8, 2021, Infinity Medical purportedly provided NCV tests to an Insured named FM. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the right median motor nerve as "5.11" at the wrist and "12.11" at the elbow. However, it is medically impossible for the amplitude of the action potential to increase between the wrist and the elbow.

(xii)  On June 8, 2022, Infinity Medical purportedly provided NCV tests to an Insured named BA. However, the results of the tests were medically impossible. Specifically, the NCV test report measured the amplitude of the action potential of the right median motor nerve as "8.1" at the wrist and "10.0" at the elbow. However, it is medically impossible for the amplitude of the action potential to increase between the wrist and the elbow.

459.   These are just representative examples.

460.   Legitimate licensed healthcare professionals who are properly trained to perform NCV tests and analyze the results would review the results in "real time" as the NCV test was being performed, investigate the cause of such medically impossible results, and either note the medically impossible results in the NCV report or redo the NCV test after the cause of the medically impossible results had been identified and corrected.

461.   Instead of identifying, investigating, notating, or correcting the medically impossible testing results, the EMG/NCV Defendants simply ignored them because addressing such results, as a legitimate healthcare professional would, was not consistent with the fraudulent, pre-determined treatment protocol implemented and directed by the Management Defendants.

462.   What is more, the EMG/NCV Defendants' "cookie-cutter" approach did not reflect individual care towards any patient and often failed to discuss and report abnormal findings after testing, particularly ones that conflicted with a radiculopathy diagnosis. For example, the Defendants failed to note the presence of a "conduction block" in several Insureds' NCV test results and reports.

463.    A conduction block is denoted in an NCV test by a finding that a nerve's motor amplitude or area was significantly lower when proximally stimulated than when distally stimulated. The presence of a conduction block is indicative of axonal damage and/or demyelination, a potentially very serious medical problem that is unlikely to be related to any Insured's automobile accident.

464.    The presence of a conduction block, however, is not consistent with a diagnosis of radiculopathy. As the tests were performed solely to maximize profits and justify further medically unnecessary treatments for Insureds, the EMG/NCV Defendants sought to diagnose Insureds with radiculopathies based on whatever scant findings were present and ignored contrary testing abnormalities, even very serious ones such as conduction blocks, which are common symptoms of peripheral nerve diseases.

465.    By omitting these abnormalities and simply diagnosing Insureds with radiculopathies, the EMG/NCV Defendants justified both their billing for the NCV tests purportedly performed as well as any additional billing for subsequent medically unnecessary treatments purportedly performed by them or the other Provider Defendants at the Clinics. As a result, to the extent that the NCV tests were performed at all and the results actually reflected the Insureds' conditions, the EMG/NCV Defendants ignored Insureds' actual medical needs simply because such needs did not comport with the EMG/NCV Defendants' for-profit scheme.

466.    The NCV tests that Defendants purported to provide to Insureds were clearly not based on medical necessity. Instead, this cookie-cutter approach was designed solely to maximize the charges that the EMG/NCV Defendants could submit to Liberty Mutual and other insurers, and to maximize their ill-gotten profits.

(d) <u>The Fraudulent Charges for EMG Tests</u>

467.     As part of their fraudulent, pre-determined treatment and billing protocol, the EMG/NCV Defendants, pursuant to the dictates of the Management Defendants, also purported to provide medically unnecessary EMGs to virtually all Insureds who received NCV tests to maximize the billing that they could submit to Liberty Mutual and other insurers.

468.     EMGs involve the insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each tested muscle is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

469.     The EMG/NCV Defendants purported to provide EMGs to Insureds in order to determine whether the Insureds suffered from radiculopathies, but the EMG/NCV Defendants did not take a proper history or examination of the Insureds that would indicate symptoms or signs of radiculopathy or any other medical problems arising from any automobile accidents.

470.     In actuality, to the extent that the EMG/NCV Defendants provided EMGs to Insureds at all, the tests were provided as part of the Management Defendants' fraudulent, pre-determined treatment protocol designed solely to maximize the billing that they could submit for each Insured, not to treat or otherwise benefit the Insureds purportedly subjected to this testing.

471.     There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number

of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient to patient.

472.    As with their NCV tests, the EMG/NCV Defendants did not tailor the EMGs they purported to perform and/or provide to the unique circumstances of each patient. Instead, the EMG/NCV Defendants routinely tested the same muscles in the same limbs repeatedly, without regard to each patient's presentment.

473.    Furthermore, even if there was any need for any of the EMGs, the nature and number of the EMGs that the EMG/NCV Defendants purported to perform and/or provide grossly exceeded the maximum number of limbs that should be tested – i.e., EMGs of two limbs – in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

474.    According to the Recommended Policy, EMG tests of two limbs are the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients.

475.    The Defendants typically billed for EMGs under CPT Codes 95861, 95864, and 95886. Pursuant to the Fee Schedule, EMG studies under CPT Codes 95861, 95864, and 95886 are only reimbursable if performed on at least five muscles in each limb tested.

476.    In that regard, many of the Defendants' studies were medically useless because the EMG/NCV Defendants tested an insufficient number of muscles per limb to be able to render an accurate diagnosis and corroborate the billing of a "complete" single-limb EMG study – i.e., the Defendants' EMG studies often tested less than five muscles per limb.

477.    Along similar lines, in order to bill for EMG studies under CPT Code 95886, the provider must perform a needle EMG on each extremity, with related paraspinal areas, on five or more muscles that are innervated by three or more nerves or four or more spinal levels.

101

478.     Thus, the EMG tests were not eligible to be billed under CPT Code 95886 because five muscles which are supplied by three or more nerves or four or more spinal levels were not tested.

479.     In addition, for every upper extremity and lower extremity EMG performed, the EMG/NCV Defendants frequently tested exactly the same muscles on each Insured.

480.     The lack of variation in muscles tested demonstrates that the EMG tests were not tailored to patients' individualized needs, but rather were just another step in the Defendants' fraudulent scheme to bill Liberty Mutual and other insurers thousands of dollars for medically unnecessary tests.

481.     In keeping with the fact that the purported results of the EMG tests were fraudulent, in cases where abnormalities were reported as indications of denervation, other recorded parts of the EMG test were incompatible with such a finding.

482.     For example, in cases where positive sharp waves and/or fibrillations were present, insertional activity was often noted to be normal. However, increased insertional activity is typically the earliest EMG sign of nerve irritation and/or damage.

483.     Indeed, when a patient experiences loss of nerve supply, the first indication of this issue would be increased insertional activity. Increased insertional activity results when electrical activity continues in a muscle at rest despite the cessation of needle movement.

484.     Positive sharp waves and fibrillations, which are indicative of denervation and generally seen together, follow increased insertional activity.

485.     If there is early denervation, it may be possible to see only increased insertional activity. However, if there are positive sharp waves and/or fibrillations, there must also be increased insertional activity.

102

486.     Therefore, it is medically impossible for EMG test results to show positive sharp waves and/or fibrillations without also noting increased insertional activity, as the former do not occur in the absence of the latter.

487.     In keeping with the fact that the purported EMG tests were medically useless, the putative "results" were not incorporated into any Insured's treatment plan, and they played no genuine role in the treatment or care of the Insureds.

488.     In keeping with the fact that the EMG/NCV Defendants performed these Fraudulent Services pursuant to a pre-determined treatment and billing protocol designed solely to maximize profits, the EMG/NCV Defendants often performed or purported to perform the EMG and NCV tests immediately following the initial neurological consultations.

489.     A proper neurological history and examination followed by a thoroughly conducted EMG and NCV test would require the Defendants to spend at least two hours with each patient.

490.     The fact that each Insured purportedly subjected to the fraudulent EMG and NCV tests set aside at least two hours to receive a neurological consultation and subsequent EMG/NCV testing indicates that either: (i) the patients knew in advance that they were to receive the EMG and NCV tests because these tests were rendered pursuant to a fraudulent, pre-determined treatment protocol; or (ii) the EMG and NCV tests were not actually performed as billed.

491.     What is more, there is a clear disconnect between the findings of an Insured's NCV test and the performance of the EMG test.

492.     This is best demonstrated in cases where the NCV test is suggestive of Carpal Tunnel Syndrome. In those cases, an abnormal median nerve NCV test was recorded. Following that finding, EMG tests of muscles supplied by the median nerve, such as the abductor pollicis

brevis and opponens pollicis, should have and would have been done by any legitimate medical professional.

493.    However, in many of the cases in which an NCV test finding was suggestive of Carpal Tunnel Syndrome, EMG testing of the muscles supplied by the median nerve was virtually never done to determine whether or not they showed loss of nerve supply. If they had in fact been done, and had shown loss of nerve supply, this would potentially increase the urgency of a patient's treatment.

494.    The lack of correlation between the findings of the NCV tests and the performance of the EMG tests further illustrates that the Fraudulent Services were performed pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to maximize profits, not to treat or otherwise benefit the Insureds purportedly subjected to this testing.

(e)  The Fraudulent "Radiculopathy" Diagnoses

495.    Radiculopathies – disorders of spinal nerve roots – were found to be low frequency in motor vehicle accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D., and published in Muscle & Nerve, the official journal of AANEM. Radiculopathies occurred in, at most, 19 percent of the accident victims who participated in this study.

496.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the EMG/NCV Defendants purportedly treated.

497.    As a result, the frequently of radiculopathy in all motor vehicle accident victims –
not only those who have relatively serious injuries that require referral to a major hospital EDX
laboratory – could be expected to be lower than 19 percent.

498.    Virtually none of the Insureds whom the Provider Defendants purported to treat
suffered any serious medical problems as the result of any automobile accidents, much less any
radiculopathy. In fact, in the unlikely event that an Insured did present with such problems or
symptoms, the deficient initial examinations were incapable of assessing and/or diagnosing them.

499.    Even so, the Defendants falsely purported to diagnose radiculopathies in a majority
of the Insureds who purportedly received EMG and NCV tests.

500.    The Defendants purported to arrive at their fraudulent, pre-determined
radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a
false justification for the medically unnecessary Fraudulent Services, including the EMG and NCV
tests.

### E.    Gorelik Self-Referrals

501.    To further increase their ill-gotten gains, once Gorelik, Amon Chiro, and Cronos
Chiro obtained access to the Avenue X Clinic's Insureds, in many instances the Insureds were
shuttled from Amon Chiro to Cronos Chiro.

502.    In particular, and as part and parcel of the fraudulent scheme devised by the
Management Defendants, Gorelik and Defendants Amon Chiro and Cronos Chiro (collectively,
the "Self-Referral Defendants") routinely engaged in a pattern of illegal self-referrals whereby
Gorelik caused individuals to be referred for Fraudulent Services between the Self-Referral
Defendants. This self-referral scheme was designed to: (i) maximize fraudulent billing

opportunities; and (ii) minimize the amount of fraudulent billing submitted through any one of the Provider Defendants, and thereby conceal and perpetuate their fraudulent scheme.

503.    Pursuant to New York Public Health Law § 238-d, a chiropractor is prohibited from referring patients to healthcare practices in which he or she has an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available."

504.    Indeed, during the EUO of Amon Chiro, Gorelik admitted that he does not inform patients that he owns both Amon Chiro and Cronos Chiro when treating the same patients from both practices. In fact, Amon Chiro and Cronos Chiro appear to have little delineation between the two. Both Amon Chiro and Cronos Chiro render services from the Avenue X Clinic, are owned by Gorelik, use the same chiropractors, and treat the same Insureds on the same day. Specifically, approximately 75% of Amon Chiro's patients were also patients of Cronos Chiro.

**F.    The Fraudulent Billing for Services Provided by Independent Contractors**

505.    The Defendants' fraudulent scheme also included the submission of claims to Liberty Mutual in the name of the Provider Defendants seeking payment for services provided by independent contractors.

506.    Under the New York No-Fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations themselves or by their employees.

507.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement

under the New York No-Fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion Letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

508.     The Defendants routinely submitted charges to Liberty Mutual and other insurers for Fraudulent Services that purportedly were performed by professionals other than the Nominal Owners.

509.     The individuals working under the names of the Provider Defendants set their own work schedules or had their schedules set for them by the Management Defendants.

510.     The individuals working under the names of the Provider Defendants worked without any supervision by the Nominal Owners.

511.     The professionals working under the names of the Provider Defendants did not exclusively provide services for the Provider Defendants.

512.     To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare providers other than the Nominal Owners were performed by professionals whom the Defendants treated as independent contractors.

513.     For instance, the Defendants:

(i)      paid the professionals, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)     established an understanding with the professionals that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to the professionals;

(iv)     failed to secure and maintain W-4 or I-9 forms for the professionals;

(v)      failed to withhold federal, state, or city taxes on behalf of the professionals;

(vi)     compelled the professionals to pay for their own malpractice insurance at their own expense;

(vii)    permitted the professionals to set their own schedules and days on which they desired to perform services;

(viii)   permitted the professionals to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices;

(ix)     failed to cover the professionals for either unemployment or workers' compensation benefits; and

(x)      filed corporate and payroll tax returns (e.g., Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the professionals were independent contractors.

514.     By electing to treat the professionals as independent contractors, the Defendants realized significant economic benefits, such as:

(i)      avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax as required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

     (iii)     avoiding payment of the FICA excise tax as required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

     (iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

     (v)     avoiding the need to secure any malpractice insurance; and

     (vi)     avoiding claims of agency-based liability arising from work performed by the treating providers.

515.    Because the professionals were independent contractors and performed the Fraudulent Services, the Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

516.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the Provider Defendants to make it appear as if the services were eligible for reimbursement.

517.    The Defendants' misrepresentations were consciously designed to mislead Liberty Mutual into believing that it was obligated to pay for these services, when in fact Liberty Mutual was not.

**G.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to Liberty Mutual**

518.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports through the Provider Defendants to Liberty Mutual seeking payment for services for which the Defendants were not entitled to receive payment.

519.    The NF-3 forms, HCFA-1500 forms, and/or treatment reports submitted to Liberty Mutual by and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and/or treatment reports uniformly misrepresented to Liberty Mutual that the Provider Defendants were lawfully licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not properly licensed in that they were professional healthcare practices that were unlawfully incorporated and/or unlawfully owned and controlled by, and illegally split fees with, the Management Defendants and others, who are not licensed medical professionals.

(ii)    The NF-3 forms, HCFA-1500 forms, and/or treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to Liberty Mutual that the healthcare services were medically necessary and that the services actually were performed. In fact, many of the services were not medically necessary. To the extent the healthcare services were performed, they were performed pursuant to fraudulent, pre-determined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them, and were provided pursuant to the improper financial arrangements between the Defendants.

(iii)   The NF-3 forms, HCFA-1500 forms, and/or treatment reports submitted by and on behalf of the Defendants misrepresented and exaggerated the nature and level of the services that purportedly were provided.

(iv)    The NF-3 forms, HCFA-1500 forms, and/or treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to Liberty Mutual that the Provider Defendants were in compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not in compliance with all material licensing laws in that they engaged in illegal financial arrangements.

(v)     With the exception of NF-3 forms, HCFA-1500 forms, and/or treatment reports covering services actually performed by the Nominal Owners, the NF-3 forms, HCFA-1500 forms, and/or treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to Liberty Mutual that the Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Defendants were not eligible to seek or pursue the collection of No-Fault Benefits for the services that purportedly were performed because the services were provided by independent contractors, to the extent that they were provided at all.

**H.      Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance**

520.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to Liberty Mutual.

521.    To induce Liberty Mutual to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

522.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants were unlawfully owned and/or controlled and were engaged in unlawful financial arrangements with unlicensed persons, and therefore were ineligible to bill for or collect No-Fault Benefits.

523.    For example, the Defendants misrepresented ownership of and control over the Provider Defendants in filings with the New York State Department of Education, so as to: (i) induce the New York State Department of Education ("DOE") to issue the licenses required to permit the Provider Defendants to engage in the practice of a licensed profession; (ii) induce the DOE to continue to recognize the Provider Defendants as being legally organized and authorized to practice their respective professions; and/or (iii) induce the DOE to allow the licensed professionals to continue to lawfully practice their profession, despite the control of their licenses by unlicensed laypersons.

524.    The Management Defendants also entered into various financial arrangements with the Provider Defendants that were designed to, and did, conceal their true ownership of and control over the Provider Defendants, as well as their unlawful financial arrangements.

525.    Furthermore, the billing and supporting documentation submitted by the Defendants for the Fraudulent Services, when viewed in isolation, does not reveal its fraudulent nature.

526.    Nevertheless, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the Fraudulent Services were medically unnecessary and were performed pursuant to fraudulent, pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to them.

527.    In every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly concealed the fact that the Defendants misrepresented and exaggerated the level and nature of the services purportedly provided and inflated the billing to insurers.

528.    The Defendants also billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing Liberty Mutual from identifying the pattern of fraudulent charges submitted through any one entity.

529.    The Defendants also knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the Provider Defendants derived their patient base from illegal financial relationships. The Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Provider Defendants were unlawfully licensed and unlawfully split fees with unlicensed persons.

530.    The Defendants also submitted billing to Liberty Mutual for Fraudulent Services that were performed by independent contractors – rather than by employees of the Provider Defendants – and, as such, were not reimbursable under the No-Fault regulations.

531.    In furtherance of the fraudulent scheme, the Defendants hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers. These law firms routinely filed expensive and time-consuming litigation against Liberty Mutual and other insurers if the charges were not promptly paid in full.

532.    The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex, fraudulent scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

533.    Liberty Mutual is under statutory and contractual obligations to process claims promptly and fairly within 30 days. The facially valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Liberty Mutual to rely upon them. As a result, Liberty Mutual incurred damages of more than $855,000.00 based upon the fraudulent charges.

534.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

535.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

536.    There is an actual case in controversy between Liberty Mutual and the Defendants regarding more than $381,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to Liberty Mutual under the names of the Provider Defendants.

537.    The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the names of the Provider Defendants because the Provider Defendants were unlawfully incorporated, and/or secretly and unlawfully owned and controlled by unlicensed individuals and entities, and illegally operating.

538.    The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the names of the Provider Defendants because the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to fraudulent, pre-determined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

539.    The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the names of the Provider Defendants because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual.

540.    The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the names of the Provider Defendants because the Provider Defendants engaged in unlawful financial arrangements with unlicensed individuals and entities as part of a

scheme to defraud New York automobile insurers and, therefore, were ineligible to bill for or to collect No-Fault Benefits.

541.     The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the Fraudulent Services were provided – to the extent that they were provided at all – by independent contractors, rather than by employees of the Provider Defendants.

542.     Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

> (i)      the Provider Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because they were unlawfully incorporated, and/or illegally owned and/or controlled by unlicensed laypersons and, therefore, are ineligible to seek or recover No-Fault Benefits;

> (ii)     the Provider Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the Fraudulent Services were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols designed solely to maximize charges to Liberty Mutual, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly have been subjected to them;

> (iii)    the Provider Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the CPT Codes used for the Fraudulent Services misrepresented and exaggerated the nature and level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual.

> (iv)     the Provider Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because they engaged in a scheme to defraud Liberty Mutual and other insurers through unlawful financial arrangements; and

> (v)      the Provider Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the Fraudulent Services were provided – to the extent that they were provided at all – by independent contractors, rather than by employees of the Provider Defendants.

## AS AND FOR AN SECOND CAUSE OF ACTION
### Against Gorelik, the Management Defendants, and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

543.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

544.    Cronos Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

545.    Gorelik, the Management Defendants, and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Cronos Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Cronos Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and/or owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful financial arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for services were not medically necessary and were not the result of professional judgment; (iv) the billed-for services were performed and billed pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for services were performed pursuant to improper financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

116

546.     Cronos Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gorelik, the Management Defendants, and John Doe Defendants operated Cronos Chiro, inasmuch as Cronos Chiro was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Cronos Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

547.     Cronos Chiro is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is unlawfully incorporated, owned, and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. These inherently unlawful acts are taken by Cronos Chiro in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent No-Fault billing.

548.     Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $157,000.00 pursuant to the fraudulent bills submitted by the Defendants through Cronos Chiro.

549.     By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
### Against Gorelik, the Management Defendants, and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

550.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

551.    Cronos Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

552.    Gorelik, the Management Defendants, and John Doe Defendants are employed by and/or associated with the Cronos Chiro enterprise.

553.    Gorelik, the Management Defendants, and John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Cronos Chiro enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Cronos Chiro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully organized and/or owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful financial arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for services were performed and billed pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to enrich the Defendants; (iv) the billed-for services were performed pursuant to improper financial arrangements between the Defendants; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted.

554.    Gorelik, the Management Defendants, and John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual

118

and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

555.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $157,000.00 pursuant to the fraudulent bills submitted by the Defendants through Cronos Chiro.

556.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Against Cronos Chiro, Gorelik, the Management Defendants, and John Doe Defendants
### (Common Law Fraud)

557.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

558.    Cronos Chiro, Gorelik, the Management Defendants, and John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

559.    The false and fraudulent statements of material fact and acts of concealment include: (i) in every claim, the representation that Cronos Chiro was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was unlawfully incorporated and/or actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Cronos Chiro was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation

119

engaged in illegal financial arrangements with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were the result of professional judgment and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a fraudulent, pre-determined protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level and nature of the service that purportedly was provided.

560.   Cronos Chiro, Gorelik, the Management Defendants, and John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Cronos Chiro that were not compensable under the No-Fault Laws.

561.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $157,000.00 pursuant to the fraudulent bills submitted by the Defendants through Cronos Chiro.

562.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

563.   Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
**Against Cronos Chiro, Gorelik, the Management Defendants, and John Doe Defendants**
**(Unjust Enrichment)**

564.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

565.    As set forth above, Cronos Chiro, Gorelik, the Management Defendants, and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

566.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Cronos Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

567.    Cronos Chiro, Gorelik, the Management Defendants, and John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

568.    The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

569.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $157,000.00.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Against Belyanskaya, the Management Defendants, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

570.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

571.    Belyanskaya OT is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

572.    Belyanskaya, the Management Defendants, and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Belyanskaya OT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal

mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Belyanskaya OT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and/or owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful financial arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for services were not medically necessary and were not the result of professional judgment; (iv) the billed-for services were performed and billed pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for services were performed pursuant to improper financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

573.    Belyanskaya OT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Belyanskaya, the Management Defendants, and John Doe Defendants operated Belyanskaya OT, inasmuch as Belyanskaya OT was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Belyanskaya OT to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

574.    Belyanskaya OT is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is unlawfully incorporated, owned,

and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. These inherently unlawful acts are taken by Belyanskaya OT in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent No-Fault billing.

575.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $157,000.00 pursuant to the fraudulent bills submitted by the Defendants through Belyanskaya OT.

576.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A SEVENTH CAUSE OF ACTION
**Against Belyanskaya, the Management Defendants, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

577.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

578.    Belyanskaya OT is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

579.    Belyanskaya, the Management Defendants, and John Doe Defendants are employed by and/or associated with the Belyanskaya OT enterprise.

580.    Belyanskaya, the Management Defendants, and John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Belyanskaya OT enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon

the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Belyanskaya OT was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully organized and/or owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful financial arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for services were performed and billed pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to enrich the Defendants; (iv) the billed-for services were performed pursuant to improper financial arrangements between the Defendants; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted.

581.    Belyanskaya, the Management Defendants, and John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

582.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $157,000.00 pursuant to the fraudulent bills submitted by the Defendants through Belyanskaya OT.

583.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Belyanskaya OT, Belyanskaya, the Management Defendants, and John Doe Defendants
### (Common Law Fraud)

584.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

585.     Belyanskaya OT, Belyanskaya, the Management Defendants, and John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

586.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Belyanskaya OT was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was unlawfully incorporated and/or actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Belyanskaya OT was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal financial arrangements with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were the result of professional judgment and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a fraudulent, pre-determined protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level and nature of the service that purportedly was provided.

587.     Belyanskaya OT, Belyanskaya, the Management Defendants, and John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Belyanskaya OT that were not compensable under the No-Fault Laws.

588.     Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $157,000.00 pursuant to the fraudulent bills submitted by the Defendants through Belyanskaya OT.

589.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

590.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A NINTH CAUSE OF ACTION
**Against Belyanskaya OT, Belyanskaya, the Management Defendants, and John Doe Defendants**
**(Unjust Enrichment)**

591.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

592.     As set forth above, Belyanskaya OT, Belyanskaya, the Management Defendants, and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

593.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Belyanskaya OT for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

594.     Belyanskaya OT, Belyanskaya, the Management Defendants, and John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

595.     The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

596.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $157,000.00.

## AS AND FOR A TENTH CAUSE OF ACTION
### Against Bakry, the Management Defendants, and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

597.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

598.     Priority Care is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

599.     Bakry, the Management Defendants, and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Priority Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Priority Care was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and/or owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful financial arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for services were not medically necessary and were not the result of professional judgment; (iv) the billed-for services were performed and billed pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for services were performed pursuant to improper financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services

127

that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

600.    Priority Care's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Bakry, the Management Defendants, and John Doe Defendants operated Priority Care, inasmuch as Priority Care was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Priority Care to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

601.    Priority Care is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is unlawfully incorporated, owned, and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. These inherently unlawful acts are taken by Priority Care in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent No-Fault billing.

602.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $142,000.00 pursuant to the fraudulent bills submitted by the Defendants through Priority Care.

603.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
**Against Bakry, the Management Defendants, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

604.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

605.    Priority Care is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

606.    Bakry, the Management Defendants, and John Doe Defendants are employed by and/or associated with the Priority Care enterprise.

607.    Bakry, the Management Defendants, and John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Priority Care enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Priority Care was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully organized and/or owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful financial arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for services were performed and billed pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to enrich the Defendants; (iv) the billed-for services were performed pursuant to improper financial arrangements between the Defendants; and (v) the

billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted.

608.     Bakry, the Management Defendants, and John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

609.     Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $142,000.00 pursuant to the fraudulent bills submitted by the Defendants through Priority Care.

610.     By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A TWELFTH CAUSE OF ACTION
**Against Priority Care, Bakry, the Management Defendants, and John Doe Defendants**
**(Common Law Fraud)**

611.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

612.     Priority Care, Bakry, the Management Defendants, and John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

613.     The false and fraudulent statements of material fact and acts of concealment include: (i) in every claim, the representation that Priority Care was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11

N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was unlawfully incorporated and/or actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Priority Care was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal financial arrangements with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were the result of professional judgment and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a fraudulent, pre-determined protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level and nature of the service that purportedly was provided.

614.    Priority Care, Bakry, the Management Defendants, and John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Priority Care that were not compensable under the No-Fault Laws.

615.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $142,000.00 pursuant to the fraudulent bills submitted by the Defendants through Priority Care.

616.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

617.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
**Against Priority Care, Bakry, the Management Defendants, and John Doe Defendants**
**(Unjust Enrichment)**

618.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

619.    As set forth above, Priority Care, Bakry, the Management Defendants, and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

620.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Priority Care for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

621.    Priority Care, Bakry, the Management Defendants, and John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

622.    The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

623.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $142,000.00.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
**Against Katz, the Management Defendants, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

624.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

132

625.    Neptune Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

626.    Katz, the Management Defendants, and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Neptune Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Neptune Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and/or owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful financial arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for services were not medically necessary and were not the result of professional judgment; (iv) the billed-for services were performed and billed pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for services were performed pursuant to improper financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

627.    Neptune Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Katz, the Management Defendants, and John Doe Defendants operated Neptune Medical, inasmuch as Neptune Medical was never eligible to bill for or collect

133

No-Fault Benefits, and acts of mail fraud therefore were essential in order for Neptune Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

628.    Neptune Medical is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is unlawfully incorporated, owned, and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. These inherently unlawful acts are taken by Neptune Medical in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent No-Fault billing.

629.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted by the Defendants through Neptune Medical.

630.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FIFTEENTH CAUSE OF ACTION
**Against Katz, the Management Defendants, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

631.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

632.    Neptune Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

134

633.   Katz, the Management Defendants, and John Doe Defendants are employed by and/or associated with the Neptune Medical enterprise.

634.   Katz, the Management Defendants, and John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Neptune Medical enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Neptune Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully organized and/or owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful financial arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for services were performed and billed pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to enrich the Defendants; (iv) the billed-for services were performed pursuant to improper financial arrangements between the Defendants; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted.

635.   Katz, the Management Defendants, and John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

636.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted by the Defendants through Neptune Medical.

637.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### Against Neptune Medical, Katz, the Management Defendants, and John Doe Defendants
### (Common Law Fraud)

638.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

639.    Neptune Medical, Katz, the Management Defendants, and John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

640.    The false and fraudulent statements of material facts and acts of concealment include: (i) in every claim, the representation that Neptune Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was unlawfully incorporated and/or actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Neptune Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal financial arrangements with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, were not the result of professional judgment, and were performed and billed pursuant to a fraudulent, pre-determined protocol designed solely to enrich the Defendants; and (iv) in every

136

claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level and nature of the service that purportedly was provided.

641.    Neptune Medical, Katz, the Management Defendants, and John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Neptune Medical that were not compensable under the No-Fault Laws.

642.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $71,000.00 pursuant to the fraudulent bills submitted by the Defendants through Neptune Medical.

643.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

644.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
**Against Neptune Medical, Katz, the Management Defendants, and John Doe Defendants
(Unjust Enrichment)**

645.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

646.    As set forth above, Neptune Medical, Katz, the Management Defendants, and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

647.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Neptune Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

648.     Neptune Medical, Katz, the Management Defendants, and John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

649.     The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

650.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $71,000.00.

### AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
**Against County Medical, Focazio, the Management Defendants, and John Doe Defendants
(Common Law Fraud)**

651.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

652.     County Medical, Focazio, the Management Defendants, and John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

653.     The false and fraudulent statements of material fact and acts of concealment include: (i) in every claim, the representation that County Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was unlawfully organized and/or actually owned and

controlled by unlicensed laypersons; (ii) in every claim, the representation that County Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal financial arrangements with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were the result of professional judgment and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a fraudulent, pre-determined protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level and nature of the service that purportedly was provided. The fraudulent bills and corresponding mailings submitted to Liberty Mutual through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

654.    County Medical, Focazio, the Management Defendants, and John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through County Medical that were not compensable under the No-Fault Laws.

655.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $78,000.00 pursuant to the fraudulent bills submitted by the Defendants through County Medical.

656.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

657.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A NINETEENTH CAUSE OF ACTION
**Against County Medical, Focazio, the Management Defendants, and John Doe Defendants
(Unjust Enrichment)**

658.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

659.     As set forth above, County Medical, Focazio, the Management Defendants, and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

660.     When Liberty Mutual paid the bills and charges submitted by or on behalf of County Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

661.     County Medical, Focazio, the Management Defendants, and John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

662.     The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

663.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $78,000.00.

## AS AND FOR A TWENTIETH CAUSE OF ACTION
### Against Gorelik SP, Gorelik, the Management Defendants, and
### John Doe Defendants
### (Common Law Fraud)

664.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

665.   Gorelik SP, Gorelik, the Management Defendants, and John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

666.   The false and fraudulent statements of material fact and acts of concealment include: (i) in every claim, the representation that Gorelik SP was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was actually owned and/or controlled by non-medical laypersons; (ii) in every claim, the representation that Gorelik SP was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the licensed healthcare practitioner and the practice engaged in illegal financial arrangements with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, were not the result of professional judgment, and were performed and billed pursuant to a fraudulent, pre-determined protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level and nature of the service that purportedly was provided. The fraudulent bills

and corresponding mailings submitted to Liberty Mutual through the date of this Complaint are described in the chart annexed hereto as Exhibit "6".

667.    Gorelik SP, Gorelik, the Management Defendants, and John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Gorelik SP that were not compensable under the No-Fault Laws.

668.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $74,000.00 pursuant to the fraudulent bills submitted by the Defendants through Gorelik SP.

669.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

670.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
### Against Gorelik SP, Gorelik, the Management Defendants, and John Doe Defendants
### (Unjust Enrichment)

671.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

672.    As set forth above, Gorelik SP, Gorelik, the Management Defendants, and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

673.   When Liberty Mutual paid the bills and charges submitted by or on behalf of Gorelik SP for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

674.   Gorelik SP, Gorelik, the Management Defendants, and John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

675.   The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

676.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $74,000.00.

### AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
**Against Mahmoud, the Management Defendants, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

677.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

678.   Best Touch is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

679.   Mahmoud, the Management Defendants, and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Best Touch's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since its inception seeking payments that Best Touch was not eligible to receive under the No-Fault Laws because: (i) it was

143

unlawfully incorporated and/or owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful financial arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for services were not medically necessary and were not the result of professional judgment; (iv) the billed-for services were performed and billed pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to enrich the Defendants; (v) the billed-for services were performed pursuant to improper financial arrangements between the Defendants; and (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

680.    Best Touch's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mahmoud, the Management Defendants, and John Doe Defendants operated Best Touch, inasmuch as Best Touch was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Best Touch to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Best Touch continues to submit bills to Liberty Mutual to the present day.

681.    Best Touch is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is unlawfully incorporated, owned, and/or controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State

Department of State. These inherently unlawful acts are taken by Best Touch in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent No-Fault billing.

682.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $53,000.00 pursuant to the fraudulent bills submitted by the Defendants through Best Touch.

683.   By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A TWENTY-THIRD CAUSE OF ACTION**
**Against Mahmoud, the Management Defendants, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

684.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

685.   Best Touch is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

686.   Mahmoud, the Management Defendants, and John Doe Defendants are employed by and/or associated with the Best Touch enterprise.

687.   Mahmoud, the Management Defendants, and John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Best Touch enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Best Touch was not eligible to receive under the No-Fault Laws because: (i) it was

unlawfully organized and/or owned and controlled by unlicensed laypersons; (ii) it engaged in unlawful financial arrangements with unlicensed laypersons in contravention of New York law; (iii) the billed-for services were performed and billed pursuant to a fraudulent, pre-determined treatment and billing protocol designed solely to enrich the Defendants; (iv) the billed-for services were performed pursuant to improper financial arrangements between the Defendants; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted.

688.   Mahmoud, the Management Defendants, and John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

689.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $53,000.00 pursuant to the fraudulent bills submitted by the Defendants through Best Touch.

690.   By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A TWENTY-FOURTH CAUSE OF ACTION
### Against Best Touch, Mahmoud, the Management Defendants, and John Doe Defendants
### (Common Law Fraud)

691.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

692.   Best Touch, Mahmoud, the Management Defendants, and John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty

146

Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

693.    The false and fraudulent statements of material fact and acts of concealment include: (i) in every claim, the representation that Best Touch was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was actually owned and/or controlled by unlicensed laypersons; (ii) in every claim, the representation that Best Touch was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal financial arrangements with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were the result of professional judgment and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a fraudulent, pre-determined protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level and nature of the service that purportedly was provided.

694.    Best Touch, Mahmoud, the Management Defendants, and John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Best Touch that were not compensable under the No-Fault Laws.

695.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $53,000.00 pursuant to the fraudulent bills submitted by the Defendants through Best Touch.

696.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

697.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-FIFTH CAUSE OF ACTION
**Against Best Touch, Mahmoud, the Management Defendants, and John Doe Defendants
(Unjust Enrichment)**

698.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

699.     As set forth above, Best Touch, Mahmoud, the Management Defendants, and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

700.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Best Touch for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

701.     Best Touch, Mahmoud, the Management Defendants, and John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

702.     The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

703.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $53,000.00.

## AS AND FOR A TWENTY-SIXTH CAUSE OF ACTION
**Against Amon Chiro, Gorelik, the Management Defendants, and John Doe Defendants
(Common Law Fraud)**

704.    Liberty Mutual incorporates, as though fully set forth herein, each and every

allegation in the paragraphs set forth above.

705.    Amon Chiro, Gorelik, the Management Defendants, and John Doe Defendants

intentionally and knowingly made false and fraudulent statements of material fact to Liberty

Mutual and concealed material facts from Liberty Mutual in the course of their submission of

hundreds of fraudulent bills seeking payment for the Fraudulent Services.

706.    The false and fraudulent statements of material fact and acts of concealment

include: (i) in every claim, the representation that Amon Chiro was properly licensed and,

therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11

N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was unlawfully incorporated and/or actually owned

and controlled by unlicensed laypersons; (ii) in every claim, the representation that Amon Chiro

was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance

Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation

engaged in illegal financial arrangements with unlicensed laypersons; (iii) in every claim, the

representation that the billed-for services were the result of professional judgment and properly

billed in accordance with the Fee Schedule, when in fact the billed-for services were performed

and billed pursuant to a fraudulent, pre-determined protocol designed solely to enrich the

Defendants; and (iv) in every claim, the representation that the charges were appropriate and

consistent with the service provided, when in fact the charges exaggerated the level and nature of

the service that purportedly was provided. The fraudulent bills and corresponding mailings

submitted to Liberty Mutual through the date of this Complaint are described in the chart annexed hereto as Exhibit "8".

707.    Amon Chiro, Gorelik, the Management Defendants, and John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Amon Chiro that were not compensable under the No-Fault Laws.

708.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $59,000.00 pursuant to the fraudulent bills submitted by the Defendants through Amon Chiro.

709.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

710.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-SEVENTH CAUSE OF ACTION
**Against Amon Chiro, Gorelik, the Management Defendants, and John Doe Defendants**
**(Unjust Enrichment)**

711.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

712.    As set forth above, Amon Chiro, Gorelik, the Management Defendants, and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

713.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Amon

Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such

payments based on the Defendants' improper, unlawful, and/or unjust acts.

714.     Amon Chiro, Gorelik, the Management Defendants, and John Doe Defendants have

been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a

benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and

unjust billing scheme.

715.     The Defendants' retention of Liberty Mutual's payments violates fundamental

principles of justice, equity, and good conscience.

716.     By reason of the above, the Defendants have been unjustly enriched in an amount

to be determined at trial, but in no event less than $59,000.00.

**AS AND FOR A TWENTY-EIGHTH CAUSE OF ACTION**
**Against Infinity Medical, Raitses, the Management Defendants, and John Doe Defendants**
**(Common Law Fraud)**

717.     Liberty Mutual incorporates, as though fully set forth herein, each and every

allegation in the paragraphs set forth above.

718.     Infinity Medical, Raitses, the Management Defendants, and John Doe Defendants

intentionally and knowingly made false and fraudulent statements of material fact to Liberty

Mutual and concealed material facts from Liberty Mutual in the course of their submission of

hundreds of fraudulent bills seeking payment for the Fraudulent Services.

719.     The false and fraudulent statements of material fact and acts of concealment

include: (i) in every claim, the representation that Infinity Medical was properly licensed and,

therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11

N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was unlawfully incorporated and/or actually owned

and controlled by unlicensed laypersons; (ii) in every claim, the representation that Infinity Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal financial arrangements with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, were not the result of professional judgment, and were performed and billed pursuant to a fraudulent, pre-determined protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level and nature of the service that purportedly was provided. The fraudulent bills and corresponding mailings submitted to Liberty Mutual through the date of this Complaint are described in the chart annexed hereto as Exhibit "9".

720.    Infinity Medical, Raitses, the Management Defendants, and John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Infinity Medical that were not compensable under the No-Fault Laws.

721.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $27,000.00 pursuant to the fraudulent bills submitted by the Defendants through Infinity Medical.

722.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

723.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-NINTH CAUSE OF ACTION
**Against Infinity Medical, Raitses, the Management Defendants, and John Doe Defendants**
**(Unjust Enrichment)**

724.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

725.     As set forth above, Infinity Medical, Raitses, the Management Defendants, and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

726.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Infinity Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

727.     Infinity Medical, Raitses, the Management Defendants, and John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

728.     The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

729.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $27,000.00.

## AS AND FOR A THIRTIETH CAUSE OF ACTION
**Against Goloubenko Medical, Goloubenko, the Management Defendants, and John Doe Defendants
(Common Law Fraud)**

730.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

731.    Goloubenko Medical, Goloubenko, the Management Defendants, and John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

732.    The false and fraudulent statements of material fact and acts of concealment include: (i) in every claim, the representation that Goloubenko Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was unlawfully incorporated and/or actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Goloubenko Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal financial arrangements with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, were not the result of professional judgment, and were performed and billed pursuant to a fraudulent, pre-determined protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level and nature of the service that purportedly

was provided. The fraudulent bills and corresponding mailings submitted to Liberty Mutual through the date of this Complaint are described in the chart annexed hereto as Exhibit "10".

733.    Goloubenko Medical, Goloubenko, the Management Defendants, and John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Goloubenko Medical that were not compensable under the No-Fault Laws.

734.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $25,000.00 pursuant to the fraudulent bills submitted by the Defendants through Goloubenko Medical.

735.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

736.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A THIRTY-FIRST CAUSE OF ACTION
**Against Goloubenko Medical, Goloubenko, the Management Defendants, and John Doe Defendants**
**(Unjust Enrichment)**

737.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

738.    As set forth above, Goloubenko Medical, Goloubenko, the Management Defendants, and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

739.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Goloubenko Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

740.    Goloubenko Medical, Goloubenko, the Management Defendants, and John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

741.    The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

742.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $25,000.00.

### AS AND FOR A THIRTY-SECOND CAUSE OF ACTION
**Against Goloubenko SP, Goloubenko, the Management Defendants, and John Doe Defendants**
**(Common Law Fraud)**

743.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

744.    Goloubenko SP, Goloubenko, the Management Defendants, and John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

745.    The false and fraudulent statements of material fact and acts of concealment include: (i) in every claim, the representation that Goloubenko SP was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was actually owned and controlled by non-medical

laypersons; (ii) in every claim, the representation that Goloubenko SP was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the licensed practitioner and the healthcare practice engaged in illegal financial arrangements with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, were not the result of professional judgment, and were performed and billed pursuant to a fraudulent, pre-determined protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level and nature of the service that purportedly was provided. The fraudulent bills and corresponding mailings submitted to Liberty Mutual through the date of this Complaint are described in the chart annexed hereto as Exhibit "11".

746.    Goloubenko SP, Goloubenko, the Management Defendants, and John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Goloubenko SP that were not compensable under the No-Fault Laws.

747.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $7,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Goloubenko SP.

748.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

749.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRTY-THIRD CAUSE OF ACTION
**Against Goloubenko SP, Goloubenko, the Management Defendants, and John Doe Defendants**
**(Unjust Enrichment)**

750.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

751.    As set forth above, Goloubenko SP, Goloubenko, the Management Defendants, and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

752.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Goloubenko SP for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

753.    Goloubenko SP, Goloubenko, the Management Defendants, and John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

754.    The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

755.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $7,000.00.

### JURY DEMAND

756.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company demand that a judgment be entered in their favor:

A.      On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual;

B.      On the Second Cause of Action against Gorelik, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $157,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Gorelik, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $157,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Cronos Chiro, Gorelik, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $157,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Cronos Chiro, Gorelik, the Management Defendants, and John Doe Defendants, more than $157,000.00 in compensatory damages for

unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper;

      F.      On the Sixth of Action against Belyanskaya, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $157,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      G.      On the Seventh Cause of Action against Belyanskaya, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $157,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      H.      On the Eighth Cause of Action against Belyanskaya OT, Belyanskaya, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $157,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

      I.      On the Ninth Cause of Action against Belyanskaya OT, Belyanskaya, the Management Defendants, and John Doe Defendants, more than $157,000.00 in compensatory damages for unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper;

      J.      On the Tenth Cause of Action against Bakry, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $142,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Bakry, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $142,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Priority Care, Bakry, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $142,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Priority Care, Bakry, the Management Defendants, and John Doe Defendants, more than $142,000.00 in compensatory damages for unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Katz, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $71,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Katz, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $71,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against Neptune Medical, Katz, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an

amount to be determined at trial but in excess of $71,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Neptune Medical, Katz, the Management Defendants, and John Doe Defendants, more than $71,000.00 in compensatory damages for unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against County Medical, Focazio, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $78,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against County Medical, Focazio, the Management Defendants, and John Doe Defendants, more than $78,000.00 in compensatory damages for unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against Gorelik SP, Gorelik, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $74,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Gorelik SP, Gorelik, the Management Defendants, and John Doe Defendants, more than $74,000.00 in compensatory damages for unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper.

V.       On the Twenty-Second Cause of Action against Mahmoud, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $53,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.       On the Twenty-Third Cause of Action against Mahmoud, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $53,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.       On the Twenty-Fourth Cause of Action against Best Touch, Mahmoud, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $53,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

Y.       On the Twenty-Fifth Cause of Action against Best Touch, Mahmoud, the Management Defendants, and John Doe Defendants, more than $53,000.00 in compensatory damages for unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper;

Z.       On the Twenty-Sixth Cause of Action against Amon Chiro, Gorelik, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $59,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

AA.      On the Twenty-Seventh Cause of Action against Amon Chiro, Gorelik, the Management Defendants, and John Doe Defendants, more than $59,000.00 in compensatory

damages for unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper;

BB.    On the Twenty-Eighth Cause of Action against Infinity Medical, Raitses, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $27,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

CC.    On the Twenty-Ninth Cause of Action against Infinity Medical, Raitses, the Management Defendants, and John Doe Defendants, more than $27,000.00 in compensatory damages for unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper;

DD.    On the Thirtieth Cause of Action Goloubenko Medical, Goloubenko, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $25,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

EE.    On the Thirty-First Cause of Action against Goloubenko Medical, Goloubenko, the Management Defendants, and John Doe Defendants, more than $25,000.00 in compensatory damages for unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper;

FF.    On the Thirty-Second Cause of Action against Goloubenko SP, Goloubenko, the Management Defendants, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $7,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

GG.    On the Thirty-Third Cause of Action against Goloubenko SP, Goloubenko, the Management Defendants, and John Doe Defendants, more than $7,000.00 in compensatory damages for unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper.

Dated: June 5, 2024

RIVKIN RADLER LLP


By:    /s/  *Barry I. Levy*
          Barry I. Levy, Esq.
          Michael A. Sirignano, Esq.
          Frank P. Tiscione, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company*